544 A.2d 784

**Sandra Ann CRAIG**

v.

**STATE of Maryland.**

**No. 1547, Sept. Term, 1987.**

Court of Special Appeals of Maryland.

Aug. 3, 1988.

Certiorari Granted Dec. 21, 1988.

William H. Murphy, Jr. and M. Cristina Gutierrez (Gary S. Bernstein, on the brief), Baltimore, for appellant.

Gary E. Bair, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, William R. Hymes, State's Atty. for Howard County, A. Gallatin Warfield, III and Mary C. O'Donnell, Asst. State's Attys. for Howard County, Ellicott City, on the brief), for appellee.

Argued before WILNER, KARWACKI and WENNER, JJ.

WILNER, Judge.

Sandra Ann Craig owned and operated a kindergarten and pre-kindergarten school in Howard County known as Craig's Country Pre–School. Brooke Etze attended the school during the period August, 1984, through June 7, 1986, when she was between four and six years of age. Brooke's parents were entirely satisfied with the school and with Ms. Craig while Brooke was enrolled there.

On June 21, 1986, Mr. and Mrs. Etze read a newspaper article recounting complaints of children having been abused at Ms. Craig's school. A week or two later, they

received a letter inviting them to a meeting hosted by the county's sexual assault center and social services and health departments. They attended the meeting, and, as a result of what they learned, they contacted the sexual assault center and arranged to have Brooke evaluated by a therapist, Mary Burke. In her fourth or fifth session with Ms. Burke, Brooke said a number of things that led Ms. Burke to suspect that she had been the victim of abuse. Ms. Burke contacted the police and social services departments, who then joined in an investigation of Brooke's allegations.

In ensuing conversations with her parents and in further sessions with Ms. Burke, Brooke revealed a number of incidents of physical, sexual, and psychological abuse committed by Ms. Craig directly, by two of Ms. Craig's children —Jamal and Mika—and by other children at the school. The direct abuse by Ms. Craig included kicking Brooke on the legs and in her "private parts," inserting a stick in her vagina, and threatening her with the loss of her parents' love. A medical examination by Dr. Charles Shubin revealed a scarred hymen, with an opening nearly four times normal—"abnormal findings ... which represent very clear healed injury to this child."

As a result of these disclosures and investigations, a six-count indictment was returned in the Circuit Court for Howard County against Ms. Craig. It charged her with first degree sexual offense (Count 1), second degree sexual offense (Count 2), child abuse (Count 3), unnatural and perverted sexual practice (Count 4), common law assault (Count 5), and common law battery (Count 6). Each of these offenses, the indictment alleged, was committed "during the period of September 1984 to June 1986, at Howard County...." [1]

---

1. The investigation into Ms. Craig and the activities at her school extended beyond what allegedly occurred to Brooke Etze. Ultimately, 13 separate indictments were returned against Ms. Craig. Her son Jamal Craig was also charged in two other indictments. Trial in this case proceeded only upon the one indictment of Ms. Craig involving Brooke Etze.

Prior to trial, both sides filed a number of motions. Among those filed on behalf of Ms. Craig were a demand for particulars, a motion "for disclosure of impeaching information," a motion for discovery and production of documents, and a motion *in limine* to preclude testimony by Ms. Burke as to statements made to her by Brooke. The demand for particulars, averring that the indictment lacked "specificity and particularity," sought, among other things, the "specific acts the State alleges the defendant did to constitute the crimes charged in each and every charge" and "the date and time of the act or acts that the State alleges constituted a crime in each and every crime charged against the Defendant." In the discovery motion, Ms. Craig asked for "any material or information which tends to negate the guilt of the defendant as to the offense(s) charged," copies of "all written memoranda which any of the State's witnesses will take with them to the witness stand or refer to while testifying during the State's case in chief," and "the substance of any oral report and conclusion made in connection with the Defendant's case by each expert consulted by the State, including the results of any physical or mental examination...."

The State, for its part, moved to allow Brooke and other young children to testify through closed circuit television, pursuant to Md.Code Ann.Cts. & Jud.Proc. art., § 9–102, and to allow certain "other crimes" evidence in order to establish "a pattern of conduct on the part of the Defendant."

In lieu of a formal response to the demand for particulars and the two discovery motions, the parties agreed to an open-file discovery, i.e., the State agreed to "provide all non work-product reports in its files" as well as "a complete witness list." The one exception to this approach concerned certain records of the county health department which the Attorney General, presumably as counsel to the health department, delivered to the court for *in camera* inspection. Upon such review, the court denied the request to produce those documents, which it characterized principally as "cor-

respondence, much of it apparently unsolicited, from parents of children attending the ... facility operated by the Defendant" that did not tend "to negate or mitigate the guilt or punishment of the Defendant as to the offense(s) charged." Counsel did not press the point further and accepted the open file discovery as a sufficient response to his various motions.

Ms. Craig's motion *in limine* was effectively denied, at least to the extent that Ms. Burke was permitted to testify and to relate both verbal and non-verbal communications from Brooke made during the evaluation and therapy sessions. The State's motions were granted. Other children allegedly abused by Ms. Craig were allowed to testify as to what had occurred to them, and both they and Brooke were permitted to testify through closed circuit television.

After 12 days of trial, the jury convicted Ms. Craig on all six counts. She then discharged her trial attorneys and employed new counsel, who filed amended motions for new trial.[2] Extended evidentiary hearings were held on those motions. On September 21, 1987, however, the court finally denied the motions and imposed sentence. This appeal followed in which seven issues, three of them multi-part, are raised. Ms. Craig complains that: (1) the State withheld exculpatory evidence that it had a duty to disclose; (2) the indictment was defective; (3) the court erred in allowing the children to testify on closed circuit television; (4) it erred in admitting an opinion from Ms. Burke that Brooke was the victim of child abuse; (5) it erred in allowing Ms. Burke and Mrs. Etze to testify as to Brooke's statements to them; (6) it wrongfully excluded certain testimony of Ms. Craig's expert witness; and (7) it erred in allowing the testimony of other children as to abuse suffered by them. Interlaced with some of these complaints is the further

---

2. Trial counsel had already filed a motion and one amended motion for new trial on Ms. Craig's behalf. New counsel eventually filed two further amended motions for new trial.

charge that her trial counsel was Constitutionally incompetent.

We find no merit in any of these complaints and shall therefore affirm.

## I. WITHHELD EVIDENCE

### (1) *Introduction*

As we observed, in lieu of a formal response to Ms. Craig's various motions, the State opted to provide an open file discovery. Pursuant to that agreement, it turned over to defense counsel the "main Investigative file" of the county police department, the written statements of 16 witnesses, a therapist's report and a medical report on another alleged child-victim, all or parts of police reports involving Brooke and other children, and a report and addendum prepared by Brooke's therapist, Mary Burke.

The focus of Ms. Craig's complaint is on the material known or available to the State that was *not* disclosed, principally the therapy notes of Ms. Burke recording (1) statements made by Brooke directly to Ms. Burke, to Brooke's parents, or, in one instance, allegedly to Dr. Shubin, (2) statements made by other child-witnesses to Ms. Burke during the course of their evaluation and therapy, and (3) Ms. Burke's impressions of Brooke's credibility. Ms. Craig urges that these documents and some others recording like information contain material that is exculpatory to her, that was available to the prosecutor, that the prosecutor had a duty to disclose, and that could have influenced the verdicts in the case.

### (2) *General Duty Of Disclosure*

The duty of a prosecutor to disclose exculpatory information is a matter of both Federal and State law. In *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963), the Supreme Court held flatly that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the

good faith or bad faith of the prosecution." That holding was refined somewhat in *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), where the Court attempted to define the circumstances under which non-disclosure would warrant upsetting an adverse verdict and ordering a new trial. In that regard, the Court drew a distinction between evidence or information that was "available to the prosecutor and not submitted to the defense" and that which "had simply been discovered from a neutral source after trial." *Id.,* at 111, 96 S.Ct. at 2401.

As a prosecutor is under no "constitutional duty routinely to deliver his entire file to defense counsel," the Court rejected Agurs's plea to "treat every nondisclosure as though it were error." *Id.* Rather, it held, at 112–13, 96 S.Ct. at 2401–02:

"The proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt. Such a finding is permissible only if supported by evidence establishing guilt beyond a reasonable doubt. It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt."

(Footnotes omitted.)

Md.Rule 4–263 imposes and extends the requirement of disclosure as a matter of State law. Section (a) of the Rule requires the disclosure, even without a request, of "[a]ny material or information tending to negate or mitigate the guilt or punishment of the defendant as to the offense charged." Section (b) requires the further disclosure, upon request, of additional classes of information, including written reports and the substance of oral reports by each expert

consulted by the State "including the results of any physical or mental examination...."

Under these requirements—Federal and State—where the question of non-disclosure arises after the trial is over and the issue is the validity of the verdict, at least three considerations are usually present: (1) was the information that was allegedly withheld really exculpatory, i.e., did it tend to negate or mitigate the guilt or punishment of the defendant as to the offense(s) charged; (2) was the information reasonably available to the prosecutor so that it could have been disclosed; and (3) was it material in the sense that, when "evaluated in the context of the entire record," it "creates a reasonable doubt that did not otherwise exist." *United States v. Agurs, supra,* 427 U.S. at 112, 96 S.Ct. at 2402; see also *United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *Moore v. Illinois,* 408 U.S. 786, 92 S.Ct. 2562, 33 L.Ed.2d 706, *reh. denied* 409 U.S. 897, 93 S.Ct. 87, 34 L.Ed.2d 155 (1972); *Stevenson v. State,* 299 Md. 297, 473 A.2d 450 (1984); *Yeagy v. State,* 63 Md.App. 1, 491 A.2d 1199 (1985). Each of these considerations is in contention here. We shall begin with the second—availability.

### (3) *Availability Of The Undisclosed Information*

■ As we observed, the *Agurs* Court drew a distinction between information that was "available to the prosecutor" prior to or during trial and evidence "discovered from a neutral source after trial." 427 U.S. at 111, 96 S.Ct. at 2401. It is in the former situation that due process is most directly and significantly implicated. Md.Rule 4–263 fleshes this out a bit. Section (g) of that Rule applies the obligation of disclosure to

> "material and information in the possession or control of the State's Attorney and staff members and *any others who have participated in the investigation or evaluation of the action and who either regularly report, or*

*with reference to the particular action have reported, to the office of the State's Attorney."*

(Emphasis added.)

Health and social service agencies do not ordinarily report their findings or suspicions to the State's Attorney; indeed, in most instances they are precluded from doing so by confidentiality statutes. See, for example, Md.Code Ann. Cts. & Jud.Proc. art., § 9–109. Normally, then, material in the files of those agencies, especially material protected by privilege, would not be subject to disclosure under either due process requirements or under Rule 4–263(a)(1).[3]

A special situation exists with respect to child abuse cases, however. Since 1966, every health practitioner, every education, mental health, and social worker, and every law enforcement officer has been under a statutory obligation to make a written report whenever that person (1) has examined or treated a child, and (2) from that examination or treatment, has reason to believe that the child has sustained physical injury as a result of abuse. See 1966 Md.Laws, ch. 221. During the period relevant to this case, these reporting requirements and the follow-up actions required to be taken by the various health, social services, and law enforcement agencies were set forth in Md.Code Ann. Fam.Law art., §§ 5–901—5–912.[4] Section 5–903 required the report to be made to the local department of social

---

3. We deal here, of course, with section (a)(1) of Rule 4–263, concerning information tending to negate or mitigate guilt or punishment, and not with section (a)(2) concerning searches, seizures, statements made by the defendant to a "State agent" that the State intends to use at trial, and pre-trial identifications of the defendant by a "witness for the State."

4. Effective July 1, 1988, those provisions were amended and recodified. 1987 Md.Laws, ch. 635. They now appear as Fam.Law art., §§ 5–701—5–715. The substance of the requirements noted in this Opinion has not changed. See, however, 1988 Md.Laws, ch. 769, providing a limited exemption from the reporting requirement where the disclosure would violate the attorney-client privilege provided for in Md.Code Ann.Cts. & Jud.Proc. art., § 9–108 or the clergyman-parishioner privilege provided for in § 9–111 of that article.

services but also required that a copy of that report be sent to the State's Attorney. That duty pertained "[n]otwithstanding any law on privileged communications." In addition to certain specified information, the report was to contain "any other information that would help to determine: (i) the cause of the suspected abuse; and (ii) the identity of any individual responsible for the abuse." § 5–903(c)(5).

Section 5–905 required that, promptly after receiving a report of suspected abuse, the department of social services or the appropriate law enforcement agency, or both, must make a "thorough investigation." That investigation was to include, "(1) a determination of the nature, extent, and cause of the abuse, if any; and (2) if the suspected abuse is verified ... a determination of the identity of the person or persons responsible for the abuse...." § 5–905(b). Section 5–905(e) required, as of January, 1985, that the "agencies responsible for investigating child *sexual* abuse," including the State's Attorney, "implement a joint investigation procedure for conducting joint investigations of child sexual abuse." (Emphasis added.) Finally, § 5–905(g) required that "[w]ithin 5 business days after completion of the investigation, the local department [of social services], and the appropriate law enforcement agency, if that agency participated in the investigation, *shall make a complete written report of its findings to the local State's Attorney.*" (Emphasis added.)

Pursuant to the directive in § 5–905(e), the Howard County State's Attorney entered into an agreement with the county police and social services departments providing for joint investigations by those agencies and the sharing of information among them. That agreement also provided for a "complete written report" of the investigation to be submitted to the State's Attorney.

This requirement of information sharing was made known to Brooke's parents. Prior to the first session with Ms. Burke, Mrs. Etze signed a form acknowledging, among other things, that "the Howard County Sexual Assault

Center is mandated by law to report *suspected* sexual abuse of children to the Police or to Protective Services of the appropriate community," that "it is the policy of the Center to cooperate fully with the Police and Protective Services during the active investigation of the suspected sexual abuse or assault of a child under the age of 18," and that "Howard County Sexual Assault Center records and information are subject to subpoenas which mandate release and disclosure." (Emphasis in original.)

In the case at hand, there was indeed close cooperation between the State's Attorney's Office and the other agencies, including the sexual assault center. Assistant State's Attorney Mary C. O'Donnell attended approximately 12 of the therapy sessions conducted by Ms. Burke with Brooke, as well as several sessions conducted with the other child witnesses; she also had a dozen or so telephone conversations with Ms. Burke regarding Brooke. A written report summarizing five sessions with Brooke, from July 28 through September 2, 1986, was sent by Ms. Burke to the State's Attorney's Office, supplemented by a further report in January, 1987, summarizing three additional sessions.

On these facts—the statute, the agreement, and the actual contact and reporting—it is clear beyond cavil that the requirements of Rule 4–263 would extend to relevant material in the hands of the sexual assault center and the police and social services departments. Those agencies "participated in the investigation or evaluation of the action" and "either regularly report, or with reference to the particular action have reported, to the office of the State's Attorney." [5] Whether Ms. Burke had some subjective belief that her notes were privileged, as the State now claims, is quite

---

**5.** This does not mean, of course, that every piece of information on every document in the hands of those agencies is necessarily subject to disclosure. The information must first fall within the ambit of sections (a) or (b) of the Rule, and, even if it does, subject obviously to Constitutional constraints, section (i) permits the court, upon good cause shown, to order "that specified disclosures be restricted."

beside the point.[6]   Under the governing legal precepts, this material was available to the prosecutor, whether or not it was physically in his files.

### (4) *Exculpatory   Quality—Materiality*

■ There is, of course, a close relationship between the extent to which information is exculpatory and the extent to which it was material, and so we shall consider these two elements together.   Did any of it tend to negate or mitigate Ms. Craig's guilt, and, if so, would it, evaluated in the context of the entire record, have created a reasonable doubt that did not otherwise exist?

The case against Ms. Craig rested, to a large extent, on the credibility of Brooke, who was the lead-off witness. Brooke testified that Ms. Craig had kicked her "in my leg" and "[i]n my privates," and had stuck her with thumbtacks. She said that Ms. Craig had touched her with a stick "[i]n my private parts," which she defined as "[h]ere between my legs," and that this had occurred "[a] lot of times," sometimes "in the woods and sometimes in her office."   She stated that Ms. Craig made up rules requiring the children to hurt each other.   When asked why she did not tell her parents about these incidents, Brooke said that she was afraid because Ms. Craig had told her that "my parents wouldn't love me any more," that "my parents would get a divorce," and that "she would kill me."

On cross-examination, which was lengthy, Brooke twice stated that the stick wielded by Ms. Craig never went into her body—that she was simply hit with it.   Although she

---

**6.** Ms. Burke acknowledged her awareness that "[i]nformation is shared ... if there is a suspicion of child abuse."   In light of that, in light of her allowing Assistant State's Attorney O'Donnell to sit in on 12 therapy sessions with Brooke, in light of her dozen or so further telephone conversations with Ms. O'Donnell, in light of the acknowledgment form signed by Mrs. Etze, of which Ms. Burke was aware, and in light of the statute requiring reports to be made to the State's Attorney "[n]otwithstanding any law on privileged communications," we find it difficult to understand how Ms. Burke could reasonably have supposed that her notes would not be obtainable by the State's Attorney's Office.

claimed that other children at the school occasionally chased her or threw sticks, she denied that they had ever actually hit her or bit her or touched her "privates" with sticks. The thrust of her testimony was that the physical and sexual abuse of her was committed solely by Ms. Craig.

Dr. Charles Shubin, a pediatrician with considerable experience in dealing with abused children, examined Brooke at the request of the State. He testified that her hymen was "gaped open" to a 15 mm diameter, which was nearly four times the "absolute upper limit of normal" published by the American Medical Association. In addition, he said, "the hymen itself was not normal." Instead of being "circumferential all the way around the fold of the vagina," as it should have been, "the lower edge was considerably thickened." There was, in addition, "a retracted scar." In summary, Dr. Shubin stated that "[t]hese are clearly very abnormal findings and which represent very clear healed injury to this child." As to causation of that injury, Dr. Shubin stated,

"To cause injury to that tissue, stretch it, tear it, scar it would require pushing past an inch and a quarter with some penetrating force. Some object would have to be pushed into this child past an inch and a quarter which would be the normal range of motion to this tissue to cause the injury that we see in this diagram [that he drew for the jury]."

Dr. Shubin said that "[i]t's not possible just by examining her to say for sure what that object was and certainly impossible to say who did it" and, because the injury had healed, it was equally impossible "to say with certainty when it happened." He was quite certain, however, that the abnormal findings "were caused by the penetration of something inside of the body." A "blow or an injury to the external part of Brooke Etze's body," he said, would not have caused that kind of injury; "[i]t requires penetration into the child's body of an object small enough to fit into that area."

This opinion by Dr. Shubin was, of course, inconsistent with Brooke's testimony that the stick used by Ms. Craig had not entered her body. Dr. Shubin dismissed the inconsistency with the assertion that "I'm not aware that children are able to easily tell what inside the body means or not."

Dr. Shubin's testimony set the stage for testimony from Ms. Burke as to the revelations made to her by Brooke. She testified that Brooke had told her, during the therapy sessions, that Ms. Craig had "stuck her in the privates with a stick," that she had kicked Brooke on the legs and "in the private parts," stuck her with thumbtacks, and threatened that, if she told anyone about these incidents, her parents "will divorce, that they will abandon her or won't come to get her again." When asked how consistent Brooke was "in her disclosures that Mrs. Craig is the person who did these things to her," Ms. Burke responded, "She was totally consistent."

Ms. Craig complains specifically about the non-disclosure of 34 items contained principally in Ms. Burke's therapy notes and in two intake reports. They seem to fall into two categories—complaints by Brooke and some of the other children of abuse by persons other than Ms. Craig, and impressions by Ms. Burke of Brooke's credibility.

An examination of the items falling within the first category reveals that, with one possible exception discussed below, none of it directly exculpates Ms. Craig. Nowhere is there to be found a statement by Brooke (or by anyone else) that Ms. Craig did not kick her, or touch her "privates" with a stick, or stick her with thumbtacks, or encourage the children to abuse one another, or threaten her. Nor, with that one possible exception, did any of those items purport to attribute the vaginal injury described by Dr. Shubin to any third party to the exclusion of Ms. Craig. They simply record statements by Brooke and some of the other child-witnesses that Jamal, Mika, and some of the other children

at the school, also mistreated Brooke and the other child-witnesses.[7]

Although it is clear that impeachment evidence falls within the *Brady* rule and must be disclosed (see *United States v. Bagley, supra,* 473 U.S. at 676, 105 S.Ct. at 3380), a statement that someone other than the defendant *also* abused the victim does not necessarily detract from the evidence as to the defendant's conduct or directly tend to negate or mitigate her guilt. The bulk of this material, then, if exculpatory or of impeachment quality at all, is only marginally so. A good bit of that information, moreover—in particular, Brooke's assertions of mistreatment at the hands of Jamal, Mika, and at least five other children—was made known to defense counsel through the open file discovery and was used by him in cross-examining Brooke's mother.[8]

---

**7.** One item, of a somewhat different character, appeared in Ms. Burke's therapy notes on another child-witness, Justin. Among some undated notes is found the statement, "Denied that anyone touched him in a way he didn't like but stated that Mrs. Craig would stop touching him so he could have his snack[.] Where: abdomen & back." Ignoring the balance of the statement, Ms. Craig sees great significance in the first part—"Denied that anyone touched him in a way he didn't like"—as that was inconsistent with Justin's trial testimony that Ms. Craig had sexually abused him. Ms. Burke testified at the post-trial proceeding that this note reflected what Justin's mother had told Ms. Burke Justin had said to his pediatrician, Dr. "Bob" Irwin. Justin had never said any such thing to Ms. Burke, and Ms. Burke had never discussed it with Dr. Irwin. Neither Justin's mother nor Dr. Irwin were called as witnesses to shed any light on what, exactly, Justin had said. The note, then, represents a double-level hearsay statement which post-trial counsel could have, but did not, explore.

**8.** As we indicated, Ms. Burke prepared a written report summarizing her therapy sessions with Brooke from July 28—September 2, 1986. In that report, she recounted assertions by Brooke that "Stacy touched her breast on top of her clothes," that "[a] child at Sunday school touched her 'down there['] (points to crotch) and knocked her over," that Katie and Randy (other children at Craig's school) had told her to strip, and touched her stomach, her breast, and "across her bottom," that Salem had "reached down the front of her blouse to retrieve a toy," that "some other child" had touched her on the breasts and "touched" her with a stick, and that Jamal did " 'biting kisses' on

There was one item in this category, however, that was not made known to counsel and that requires more specific consideration.

In Ms. Burke's file was a copy of the written report of Dr. Shubin's examination of Brooke, and appended to it was a copy of a handwritten note from Ms. Burke to Fred Levi, of the protective services division of the county department of social services. The note says, in relevant part, "Am going to refer Brooke for therapy next week. *Implicated Mika as perpetrator when speaking [with] Shubin.*" (Emphasis added.) When questioned about that note at the hearing on the new trial motion, Ms. Burke indicated that this information had come to her through Brooke's parents, who were present during the examination of Brooke by Dr. Shubin. She had not discussed it with Dr. Shubin and claimed to have no recollection of what she thought of it when it was brought to her attention. Notwithstanding her statement, "[i]mplicated Mika as perpetrator," Ms. Burke said that her own notes "simply indicate ... that she [Brooke] told Dr. [Shubin] that somebody hurt me .down there, and they don't indicate who."

Dr. Shubin was not called to testify at the hearings on the motion for new trial; nor were Brooke's parents. They, of course, could have testified as to what, if anything, Brooke actually said to Dr. Shubin. As it is, all that we have is this somewhat cryptic note recording a double-level hearsay statement and Ms. Burke's somewhat vague explanation. On this record, we are unwilling to presume, as Ms. Craig urges us to do, that Brooke in fact exculpated her by attributing the vaginal injury solely to Mika. The note is, at best, an invitation to further inquiry, which, when pur-

---

Brooke's chest and neck; that he had had his clothes off and had 'touched his body against mine.'" Ms. Burke sent that report and a later addendum to it to the State's Attorney who turned it over to defense counsel as part of the open file .discovery. Although counsel did not question Brooke about these assertions, he did ask Mrs. Etze whether Brooke had ever mentioned these incidents to her. She replied in the negative.

sued as post-trial counsel chose to pursue it, revealed nothing. Assistant State's Attorney O'Donnell testified that she was unaware of the note until shown it at the new trial hearing, and that neither Ms. Burke nor Dr. Shubin had ever mentioned to her any such statement by Brooke.

The principal item in the second category came from an intake summary prepared by department of social services intake worker K. McKone on August 19, 1986, which was just after the first therapy session at which Brooke began to make disclosures leading Ms. Burke to contact the department. In the part of the summary entitled "Description of Abuse or Neglect," Ms. McKone states:

"Brooke is currently being evaluated at the SAC [Sexual Assault Center] and has had several sessions with Ms. Burke. During play therapy Brooke has disclosed that someone had touched her private parts, and she pointed to the crotch area of a doll. She said 'Roger' (fictitious name) touched her with a stick and it hurt a lot. There is no validation yet of who did this to her and where although she did attend Craig[']s Country Pre-school. *According to Ms. Burke fantasy & reality are mixed up for this child* and continued efforts will be made to determine what happened to her through continued evaluation. Next session is on 8/25—10 AM."

(Emphasis added.)

Although Ms. Craig complains of the passage concerning "Roger," she calls particular attention to the emphasized portion indicating a belief by Ms. Burke that fantasy and reality were "mixed up" for Brooke. When questioned about that at the new trial motion hearing, Ms. Burke said that she had no recollection of making that particular statement, and that it "doesn't sound like a statement I would have made to a Protective Service worker." She allowed, however, that it may have been Ms. McKone's "perception of what I was saying." Ms. Burke acknowledged "in a clinical sense that fantasy and reality were mixed for that child at that time." She continued that "that would have been typical of a child who's working through

abuse dynamics," that "young children frequently mix fact in with other types of information which are distortions. Sometimes they are motivated that out of guilt, sometimes out of fear, that everything gets rolled up together." At no point in her lengthy examination, however, did Ms. Burke indicate any belief that Brooke's accusations against Ms. Craig were inaccurate or untruthful.

The trial court reviewed each of the passages complained of by Ms. Craig in the context of the documents whence they came, the extensive testimony concerning them, and the evidence presented at trial. It observed that there was "testimony going everywhere in this case. There was testimony that the jury could pick and choose." The items at issue here, it held,

"it's not such evidence as in my judgment would probably have affected the outcome of the case. It would have just been other inconsistent statements, evidence that this jury could have perhaps reviewed and considered, but not evidence which, in my judgment, would have affected the outcome of the case."

We are not persuaded that the trial court's overall assessment was wrong.

We observe initially that none of this newly discovered evidence would, in any manner, serve to negate or mitigate Ms. Craig's guilt under Counts 3, 5, or 6 (child abuse, assault, and battery). It in no way detracts from the evidence that Ms. Craig kicked Brooke or stuck her with thumbtacks. At best, it goes only to the alleged sexual abuse, in particular whether Ms. Craig inserted a stick into Brooke's vagina, and thus pertains only to Counts 1, 2, and 4.

There was, as we have indicated, some inconsistent testimony at trial, and some of it laid open the question of Brooke's credibility.[9] She specifically denied that other

---

9. There were also, we might add, some inconsistencies and contradictions in the defense.

children had kicked, hit, or bitten her, whereas Ms. Burke recounted some of her statements to the contrary. Brooke's mother testified to specific instances of Brooke's not telling the truth, one of which involved a false accusation against another child. She conceded that "to a degree, a typical amount," there was a problem with "Brooke making up stories." She said, in particular, that, according to one of Brooke's teachers, "it was a problem at school." Trial counsel had and used Ms. Burke's reports recounting Brooke's accusations of sexual abuse or touchings on the part of Jamal and at least five other children (see n. 8, *ante*).

Viewing the undisclosed material and the explanations of it developed post-trial in the light of the evidence presented at trial, we are unable to conclude that this material (1) necessarily negated or mitigated Ms. Craig's guilt (or punishment) or (2) sufficed to create a reasonable doubt that did not otherwise exist. We are simply not persuaded that the trial judge erred in his conclusion that, even if the relevant and admissible evidence (along with the attendant explanations of it) developed post-trial had been before the jury, the verdicts would not likely have been any different.

## II.  SUFFICIENCY OF THE INDICTMENT

■ Ms. Craig makes two attacks on the indictment: (1) that the allegation as to when the offenses were committed —"during the period of September 1984 to June 1986"— was too broad and uncertain; and (2) that the indictment failed to inform her of the specific conduct charged. Although she claims that these complaints were effectively preserved for appellate review, she argues that, if they were not so preserved, it was due to the incompetence of trial counsel, which would justify relief on that basis.

We begin by noting the requirement of Md. Rule 4–252(a) that "[a] defect in the charging document other than its failure to show jurisdiction in the court or its failure to charge an offense" must be raised "by motion in conformity with this Rule and if not so raised [is] waived unless the

court, for good cause shown, orders otherwise...." With exceptions not alleged or relevant here, a motion under § 4–252(a) must be filed within 30 days after the appearance of counsel. It must state the grounds on which it is made and the relief sought.

No such motion is in the record before us; nor is there any reference to one in the docket entries. It appears that counsel filed a paper entitled "Motions Pursuant To Maryland Rule 4–252" in another case (No. 15461), apparently intending it to apply to all cases against Ms. Craig. The motion is captioned as "Case #: 15461, and others" and seeks a variety of different relief, including dismissal of the indictment on the ground "[t]hat the indictment/information is defective." Although two cases (*Ayre v. State*, 291 Md. 155, 433 A.2d 1150 (1981), and *Brown v. State*, 285 Md. 105, 400 A.2d 1133 (1979)) are cited for that proposition, there is no averment as to how or why the indictment is defective—merely the bald allegation that it is so.

Quite apart from the failure to file the motion in this proceeding,[10] we do not regard that bald statement as adequate compliance with the requirement that the motion "state the grounds upon which it is made." Certainly, it did not suffice to raise either of the two particular complaints made here. Unless those alleged defects constitute a failure to show jurisdiction in the court or to charge an offense, therefore, they have been waived, notwithstanding that the trial court allowed Ms. Craig to raise the issue in her motions for new trial.

Md. Rule 4–202(a) requires a charging document to state "with reasonable particularity" the time the offense occurred. But time is not ordinarily regarded an element of the offense or germane to jurisdiction, and it is certainly not so in this instance. The alleged violation in this regard, moreover, is not a complete absence of an allegation as to

---

10. The State conceded at oral argument that the State's Attorney was aware of the motion and apparently regarded it as applying in this case.

time but rather a violation of the "reasonable particularity" requirement. That is a matter that should and could have been raised by pre-trial motion when, if found to be meritorious, it could have been addressed and presumably corrected. The Rule does not allow such a complaint to be held until after trial has occurred and a verdict rendered. Ms. Craig's first complaint, as to time, has been waived.

■ Her second complaint, which she characterizes as a failure to charge an offense, is simply without substantive merit. In *Williams v. State*, 302 Md. 787, 791, 490 A.2d 1277 (1985), and later in *State v. Chaney*, 304 Md. 21, 497 A.2d 152 (1985), *cert. denied* 474 U.S. 1067, 106 S.Ct. 824, 88 L.Ed.2d 796 (1986), the Court made clear that not every deficiency in setting forth the elements of the offense or the particular conduct charged amounts to a jurisdictional defect. As stated in *Chaney*, 304 Md. at 25–26, 497 A.2d 152:

> "We said [in *Williams*] that a claim that an indictment fails to charge or characterize a crime is jurisdictional and may be raised at any time. But in determining, for jurisdictional purposes, whether an indictment sufficiently charges and characterizes a crime, we made clear in *Williams* that merely because the charging document does not allege, expressly or by implication, every essential element of an offense does not necessarily mean that no cognizable crime within the court's subject-matter jurisdiction has been charged. We said that while the customary method of identifying a particular crime charged in an indictment has been to aver its essential elements, that method is not exclusive 'and the use of other words that sufficiently characterize the crime will satisfy the jurisdictional requirement.'"

The language of the indictment here suffices, in our view, to charge the six offenses upon which Ms. Craig was tried and convicted.[11] Any complaint as to lack of specificity in the precise conduct has also, therefore, been waived.

---

11. The indictment charged that Ms. Craig:

We shall defer, at this point, Ms. Craig's complaint about the competence of her trial counsel but shall consider her several complaints in that regard later in this Opinion.

## III. TESTIMONY THROUGH CLOSED CIRCUIT TELEVISION

Subject to certain conditions set forth in the statute, Md.Code Ann.Cts. & Jud.Proc. art., § 9–102(a) provides that, in a case of child abuse, the court

---

"1. Did unlawfully engage in a sexual act with another person, to wit: Brook[e] Etze, by force or threat of force against her will and without her consent and did threaten or place Brook[e] Etze in fear that she or her parents would be imminently subjected to serious physical injury, in violation of Art. 27, Sec. 464, of the Annotated Code of Maryland contrary to the form of the Act of Assembly in such case made and provided, and against the peace, government and dignity of the State. (Sexual Offense—1st degree—Art. 27, Sec. 464)

2. Did unlawfully engage in a sexual act with Brook[e] Etze, a person under 14 years of age when the said Sandra Ann Craig, the person performing the sexual act is four or more years older than the said Brook[e] Etze, in violation of Art. 27, Sec. 464A, of the Annotated Code of Maryland, contrary to the form of the Act of Assembly in such case made and provided, and against the peace, government and dignity of the State. (Sexual Offense—2nd degree —Art. 27, Sec. 464A)

3. Did unlawfully as a guardian having care, custody and responsibility for the supervision of one Brook[e] Etze, a minor child under the age of eighteen years, cause abuse to the said Brook[e] Etze, contrary to the form of the Act of Assembly in such case made and provided, and against the peace, government and dignity of the State. (Child Abuse—Art. 27, Sec. 35A)

4. Did unlawfully commit a certain unnatural and perverted sexual practice with Brook[e] Etze, contrary to the form of the Act of Assembly in such case made and provided, and against the peace, government and dignity of the State. (Perverted Practice—Art. 27, Sec. 554)

5. Did unlawfully make an assault upon Brook[e] Etze, contrary to the form of the Common Law, in such case made and provided, and against the peace, government and dignity of the State. (Assault— C/L)

6. Did unlawfully commit a battery upon Brook[e] Etze, contrary to the form of the Common Law, and against the peace, government and dignity of the State. (Battery—C/L)"

"may order that the testimony of a child victim be taken outside the courtroom and shown in the courtroom by means of closed circuit television if:

(i) The testimony is taken during the proceeding; and

(ii) The judge determines that testimony by the child victim in the courtroom will result in the child suffering serious emotional distress such that the child cannot reasonably communicate."

Applying this statute, the court allowed Brooke (and several other children) to testify in the proceeding from the judge's chambers, with counsel present, through closed circuit television.

Ms. Craig contends: (1) § 9–102 and the procedure authorized by it violate her Constitutional right of confrontation; (2) the court failed to follow the proper procedure in concluding that the children would suffer serious emotional distress such that they would be unable to reasonably communicate if required to testify in court; and (3) the procedure authorized by § 9–102 and used in this case violated her right of presence.

## (1) *Confrontation*

■  When this case was tried, the parties and the court were without the benefit of any controlling appellate consideration and construction of § 9–102. After the verdicts were announced, the Court of Appeals decided *Wildermuth v. State*, 310 Md. 496, 530 A.2d 275 (1987), in which it considered a number of challenges to § 9–102, including claims that the procedure authorized by the statute contravened a defendant's rights of confrontation and presence. *Wildermuth* then became the focus of Ms. Craig's attack on the procedure used at trial, both at the hearings on the motions for new trial and in argument before us. More recently, however, the United States Supreme Court decided *Coy v. Iowa*, —— U.S.——, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988), in which it too addressed the confrontation issues raised by procedures impairing face-to-face contact between

child-witnesses and defendants on trial for having allegedly abused them.

Coy was charged with having assaulted two 13–year old girls as they slept in a tent in the backyard of their house. As the man who attacked them wore a stocking mask over his head and shined a flashlight in their eyes, the girls were unable to identify their assailant; they were not asked at trial to identify Coy.[12] Although no inquiry was made as to whether the victims would be able to present their testimony in Coy's presence, and the judge made no finding that they would be unable to do so, the trial court, acting pursuant to a recently enacted Iowa statute, permitted a semi-opaque screen to be placed in the courtroom between Coy and the witness stand. With certain adjustments to the lighting in the courtroom, the screen enabled Coy "dimly to perceive the witnesses" but totally precluded the witnesses from seeing Coy. The State sought to excuse the lack of any specific finding of necessity for separating the victims from the defendant on the ground that the statute authorizing the procedure "create[d] a legislatively imposed presumption of trauma" and thus *ipso facto* established the necessity. It urged as well that, as Coy's right of cross-examination was not impaired by the screen, there was, in fact, no violation of his right of confrontation.

In an Opinion authored by Justice Scalia, in which five other Justices joined, the Supreme Court rejected both arguments. As to the latter, the Court made clear that the right of confrontation entails more than just the right to cross-examine. Repeatedly, Justice Scalia referred to the concomitant right, of even longer historical standing, to meet one's accuser "face to face." Beyond even earlier Supreme Court decisions and English common law antecedents, he quoted from Shakespeare (Richard II), the New

---

**12.** Coy lived next door to one or both of the victims. He was convicted largely on physical evidence seized from his home—principally a cup, a flashlight, and a battery that the girls said the assailant had taken from their tent. See *State v. Coy,* 397 N.W.2d 730 (Iowa 1986).

Testament (Acts 25:16), and a 1953 speech made by President Eisenhower to the B'nai B'rith Anti–Defamation League for the proposition that "there is something deep in human nature that regards face-to-face confrontation between accused and accuser as 'essential to a fair trial in a criminal prosecution.'" Thus, he announced, "[w]e have never doubted ... that the Confrontation Clause guarantees the defendant a face-to-face meeting with witnesses appearing before the trier of fact." —— U.S. at ——, 108 S.Ct. at 2800. The screen, said Justice Scalia, "was specifically designed to enable the complaining witnesses to avoid viewing [Coy] as they gave their testimony, and the record indicates that it was successful in this objective.... It is difficult to imagine a more obvious or damaging violation of the defendant's right to a face-to-face encounter."

With that, Justice Scalia turned to the State's argument that the confrontation issue at stake was outweighed by the need to protect victims of sexual abuse. He recognized that, in earlier decisions, the Court had held that "rights conferred by the Confrontation Clause are not absolute, and may give way to other important interests" but concluded that

"The rights referred to in those cases ... were not the right narrowly and explicitly set forth in the Clause, but rather rights that are, or were asserted to be, reasonably implicit—namely, the right to cross-examine ...; the right to exclude out-of-court statements ...; and the asserted right to face-to-face confrontation at some point in the proceedings other than the trial itself.... To hold that our determination of what implications are reasonable must take into account other important interests is not the same as holding that we can identify exceptions, in light of other important interests, to the irreducible literal meaning of the clause: 'a right to *meet face to face* all those who appear and give evidence *at trial.'* ... *We leave for another day, however, the question whether any exceptions exist. Whatever they may be, they*

*would surely be allowed only when necessary to further an important public policy."*

*Id.* at ——, 108 S.Ct. at 2802–03. (Emphasis on last two sentences added; citations omitted.)

Extending that last statement, Justice Scalia specifically rejected the notion that the Iowa statute could, of itself, supply the necessity: "The exception created by the Iowa statute, which was passed in 1985, could hardly be viewed as firmly rooted. *Since there have been no individualized findings that these particular witnesses needed special protection, the judgment here could not be sustained by any conceivable exception." Id.* at ——, 108 S.Ct. at 2803. (Emphasis added.)

Justice Scalia, as we indicated, wrote for himself and five other Justices, including Justices White and O'Connor. Those two Justices, however, filed a Concurring Opinion, authored by Justice O'Connor, to make clear their view that the right to face-to-face confrontation, which they agreed had been violated in that case, was "not absolute but rather may give way in an appropriate case to other competing interests *so as to permit the use of certain procedural devices designed to shield a child witness from the trauma of courtroom testimony." Id.* (Emphasis added.) They recognized that child abuse was a problem "of disturbing proportions in today's society," that it was "one of the most difficult problems to detect and prosecute, in large part because there often are no witnesses except the victim," and that, even when "an instance of abuse is identified and prosecution undertaken, new difficulties arise" from the fact that "a child victim may suffer trauma from exposure to the harsh atmosphere of the typical courtrooom...." They observed that many States had, as a result, enacted statutes authorizing a variety of procedures to shield a child-witness, calling attention, in particular, to the fact that about half of the States permit the child's testimony to be given through closed circuit television, sometimes with and sometimes without the defendant's being present in the same room. The point of their concur-

rence was "to make clear *that nothing in today's decision necessarily dooms such efforts by state legislatures to protect child witnesses." Id.* (Emphasis added.)

In furtherance of that point, Justices O'Connor and White concluded that "even if a particular state procedure runs afoul of the Confrontation Clause's general requirements, it may come within an exception that permits its use." There is nothing novel, they said, about the proposition that the Clause embodies a general requirement that a witness face the defendant. "But it is also not novel to recognize that a defendant's 'right physically to face those who testify against him,' ... even if located at the 'core' of the Confrontation Clause, is not absolute, and I reject any suggestion to the contrary in the Court's opinion." The core of the concurrence was then stated as follows:

"In short, our precedents recognize a right to face-to-face confrontation at trial, but have never viewed that right as absolute. I see no reason to do so now and would recognize exceptions here as we have elsewhere.

Thus, I would permit use of a particular trial procedure that called for something other than face-to-face confrontation if that procedure was necessary to further an important public policy.... *The protection of child witnesses is, in my view and in the view of a substantial majority of the States, just such a policy.* The primary focus therefore likely will be on the necessity prong. I agree with the Court that more than the type of generalized legislative finding of necessity present here is required. *But if a court makes a case-specific finding of necessity, as is required by a number of state statutes ... our cases suggest that the strictures of the Confrontation Clause may give way to the compelling state interest of protecting child witnesses. Because nothing in the Court's opinion conflicts with this approach and this conclusion, I join it.*"

*Id.* at ——, 108 S.Ct. at 2805. (Emphasis added.)

Although Justice Scalia took some pains in his majority Opinion to rebut points made by Justice Blackmun and

Chief Justice Rehnquist in dissent, he made no comment at all with respect to the concurring opinion; of particular significance, we think, he chose not to comment on the passage quoted immediately above or to suggest that Justices O'Connor and White had misread either his Opinion or his intentions.

We glean at least three things from what the Justices, in their respective opinions, had to say: (1) the Court did not firmly conclude that the "face-to-face" requirement embodied in the Clause was absolute and would admit of no exceptions but simply left that question "for another day"; (2) nor did it rule out the prospect of recognizing as such an exception the State's interest in protecting child-witnesses from trauma associated with testifying in open court in the defendant's close presence; and (3) to the extent that language in Justice Scalia's opinion might suggest that a closed circuit television arrangement based on a "case-specific finding of necessity" would be regarded as impermissible under the Confrontation Clause, that view was not shared by more than four of the Justices who sat on the case.[13]

▇▇▇ The issue that the Supreme Court chose to reserve for another day is upon us in this case and must therefore, of necessity, be decided by us today. Guided in part by the Court of Appeals' analysis in *Wildermuth,* we are inclined to the view expressed by Justice O'Connor in her concurring opinion. In accordance with, and to some extent extrapolating, that view, we hold that (1) the requirement of a face-to-face meeting in court is *not* absolute, but *does* admit of exceptions; (2) where a face-to-face meeting would, in fact, so traumatize a child-witness as to prevent him or her from reasonably communicating, the State may provide for that testimony to be taken in a setting that, as nearly as practicable, preserves all other aspects embodied in the right of confrontation, but does not require the witness to

---

**13.** Justice Kennedy took no part in the consideration or decision of the case. His view of the matter has yet to be announced.

look directly upon the defendant or to testify in his direct physical presence; and (3) if § 9–102 is implemented in the manner prescribed by *Wildermuth*, that implementation will not be deemed so violative of the defendant's right of confrontation as to constitute reversible error.

The procedure authorized by § 9–102 and used in this case was essentially as follows. The judge, Ms. Craig, one of her attorneys, and a prosecutor remained in the court-room with the jury. The witness testified from the judge's chambers in the presence of a prosecutor, Ms. Craig's lead counsel, and a technician. The testimony was broadcast through closed circuit television to the courtroom where everyone there could see and hear it on one or more monitors. There was a private telephone line allowing two-way communication between Ms. Craig (and the attorney with her) and her attorney in the judge's chambers.

It is evident that this arrangement did not amount to the kind of face-to-face confrontation that the Supreme Court held was envisioned by the Sixth Amendment. The defendant and the witnesses were in different rooms, unable to see or hear each other directly. The witnesses, it would appear, were unable to see or hear Ms. Craig at all, as the broadcasting was one-way from the chambers to the courtroom; Ms. Craig could see and hear the witnesses but only through electronic means. It follows, then, that, if the face-to-face requirement, as explicated by Justice Scalia, is indeed absolute and admitting of no exceptions, this procedure would not pass muster.

We do not believe that the requirement is so rigid, however. Neither the Supreme Court nor the Maryland Court of Appeals—the two courts that bind us—has ever held any aspect of the Confrontation Clause, and certainly not this aspect of it, to be so absolute. Moreover, when one considers the "exceptions" that *have* been allowed—in particular the use of extra-judicial declarations based on a firmly rooted exception to the hearsay rule (*Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980); *United States v. Inadi*, 475 U.S. 387, 106 S.Ct. 1121, 89 L.Ed.2d 390

(1986))—they nearly always involve a situation in which evidence is given without a face-to-face confrontation at trial. That the challenge to such evidence may have been couched in terms of the right of cross-examination or some other right embodied in the Confrontation Clause does not detract from that simple fact. *Coy* did not purport to overrule *Roberts,* or *Inadi,* or any of the other decisions allowing the use of extra-judicial declarations at trial under limited circumstances, and yet, it would seem to us, that would be precisely its effect if the "face-to-face" requirement, as interpreted by Justice Scalia, were regarded as absolute and unyielding. We construe the majority Opinion in *Coy* as did the concurring Justices, as simply striking down the procedure used in that case and reserving for further consideration whether the more common approaches authorized by most of the States will suffice.

On that assumption, we may return to *Wildermuth,* where, although the point was apparently conceded by the defendants, the Court made clear its own view that the right of face-to-face confrontation "fundamental as it is, is not absolute. It 'must occasionally give way to considerations of public policy and the necessities of the case.' " 310 Md. at 514, 530 A.2d 275, quoting in part from *Mattox v. United States,* 156 U.S. 237, 243, 15 S.Ct. 337, 340, 39 L.Ed. 409 (1895). That suffices, for us, to establish the flexible quality of this right.

Having concluded that the right of face-to-face confrontation could yield to other considerations of public policy, the *Wildermuth* Court proceeded to examine the confrontation issue further in the context of the requirements set forth in *Ohio v. Roberts, supra,* 448 U.S. 56, 100 S.Ct. 2531, that in order to accept evidence in derogation of that right, even if generally permissible, there must be a showing (1) that the witness is "unavailable" and (2) that the statement offered from the witness bears adequate "indicia of reliability." The *Wildermuth* Court concluded that a finding under § 9–102(a)(1)(ii)—that, if required to testify in open court the child would suffer serious emotional distress and be

unable to "reasonably communicate"—was "tantamount to a finding of unavailability in the *Roberts* sense, and meets the necessity prong of the *Roberts* test." 310 Md. at 519, 530 A.2d 275. The Court also found that the statute "provides for most of the aspects of confrontation that enhance the reliability of testimony" and therefore also satisfied the "reliability" prong of the *Roberts* test. *Id.*, at 515, 530 A.2d 275. Thus, it held at 520, that "[t]he degree of confrontation allowed by § 9–102 ... satisfies the constitutional requirements if there is compliance with subsection (a)(1)(ii) as a condition precedent to application of the statute."

Implicit in this examination is the underlying conclusion that the State has a legitimate and compelling interest in authorizing this kind of procedure, but, to the extent that conclusion was a tacit one in *Wildermuth*, we shall articulate it now. We conceive that the State has really a two-fold interest in allowing the testimony of a child abuse victim to be given *via* closed circuit television. Paramount, of course, is the fact that, if the child-victim is actually unable to testify otherwise—if he/she would be so "traumatized" by a face-to-face confrontation as to be unable to "reasonably communicate"—the truth of the matter might never be revealed, a terrible crime might go unredressed, and a dangerous person might be turned loose to continue his or her predation, perhaps (and, in some instances, likely) upon the same helpless victim. In addition, although somewhat related, the State has an interest in protecting children generally from trauma, especially trauma that would result from the deliberate action of the State itself. Keeping in mind the threshold requirement in § 9–102, what is to be gained from forcing a child-victim to testify in the direct presence of the defendant when the only product of it will be further suffering for the child rather than any meaningful evidence—*in*culpatory or *ex*culpatory? We have no doubt that the procedure authorized by § 9–102 is one that is "necessary to further an important public policy." *Coy v. Iowa,* — U.S. at —, 108 S.Ct. at 2803.

Upon this analysis, we reject the general Confrontation Clause attack made by Ms. Craig.

### (2) *Findings As To Unavailability*

■ In rejecting Iowa's argument of "necessity," Justice Scalia observed that "[s]ince there have been no individualized findings that these particular witnesses needed special protection, the judgment here could not be sustained by any conceivable exception." —— U.S. at ——, 108 S.Ct. at 2803. The implication, of course, is that, if the right to face-to-face confrontation can be dispensed with or impaired at all, the departure must be based upon "individualized findings." It cannot rest upon some general presumption. Justices O'Connor and White were in accord on that, allowing a relaxation of the requirement only upon a "case-specific finding of necessity."

The *Wildermuth* Court reached the same conclusion. Judge Adkins observed for the Court that the statutory standard set forth in § 9–102(a)(1)(ii) was indeed a difficult one, and that, to satisfy the constraints implicit in the defendant's right of confrontation, there must be "a specific demonstration that the particular child witness concerned crosses the high statutory threshold." 310 Md. at 523, 530 A.2d 275. In that regard, the Court held, at 523–24, 530 A.2d 275:

"While personal observation by the judge may not be a *sine qua non* under § 9–102, it should be the rule rather than the exception....

On the one hand, a judge's subjective and self-justifying recollections of a child's demeanor, absent support in the record, will not be enough to justify a finding that limits the right of confrontations [sic].... On the other hand, expert testimony may not be essential to establish the necessary predicate.... For example, the testimony of a parent may be sufficient, when combined with the child's own testimony and judicial observation of the child....

We shall not attempt to list all the possible ways in which evidence may meet the standard or all the ways in which it may fall short. We repeat, however, that ordinarily the judge should observe and question the child. Additionally, testimony about the likely impact on the particular child must be specific and must show much more than mere nervousness or excitement or some reluctance to testify.... While the testimony need not be given in the precise words of the statute, it must be clear that the statutory requirements are met in substance.... Testimony about the likely impact on the child testifying must be definite, related to the statutory standard, and specific to the potential child witness him or herself."

(Citations omitted; footnote omitted.)

In *Wildermuth*, the trial court's finding was based exclusively on testimony from two social workers as to the difficulty that children in general might have testifying in court with the alleged abuser present. One witness opined that any child would find it "hard to respond at all in the courtroom." *Id.*, at 523, 530 A.2d 275. The other's testimony, though "more specific, indicating some degree of intimidation and a greater likelihood of inability to respond," still was couched in terms of "all children as a group." *Id.* The judge "never questioned or even observed the child witness before he made his ruling." *Id.* That, said the Court, did not suffice.

The case at bar is quite different. The testimony supporting the court's ruling here was far more specific than in *Wildermuth* and focused on each child. Ms. Burke, who had considerable experience in working with abused children, testified with respect to Brooke. She had observed Brooke in 20 therapy sessions, each lasting an hour to an hour and a half. Citing both Brooke's age and her perception of having been threatened, Ms. Burke opined that "it would be very difficult if not impossible for Brooke to sit in the same room with Mrs. Craig and discuss the alleged abuse incidents." She "would probably stop talking and she would withdraw and curl up."

Similar testimony was given with respect to the other child-witnesses who testified *via* closed circuit television. Ms. Burke treated two of those children, in addition to Brooke. One of them—Justin—Ms. Burke had seen in 18 therapy sessions. Seeing Ms. Craig as a "threatening figure," she said, "[h]e's had difficulty talking—making his disclosures to other people including police and protective services. He tends to change the subject which is his manner of avoiding the issue. He becomes agitated and depressed. He bursts into tears and would be unwilling or unable at that point to proceed." Of a third child—Jessie—seen in 36 therapy sessions, Ms. Burke said:

"As to Mrs. Craig, she perceives herself, again, as her life has been threatened, that of her parents and her sibling too. She believes that that—Mrs. Craig is capable and willing to carry out those threats at home and Jessie is fearful of this person. I believe that that fear would impair her ability to sit in front of that person or to be in the same room with that person, would be unable to discuss or to share with the required individuals that information which she has to share regarding these allegations."

The fourth child-witness was being treated by Dr. Gladys Sweeney, a psychologist, who said of him: "he has experienced [an] extreme level of high anxiety and distress by talking about this very traumatic event and that his ability to communicate would be grossly impaired if he were to testify in an open court in the presence of Mrs. Craig."

The testimony here, as to each child, was specific; it showed "much more than mere nervousness or excitement or some reluctance to testify." It was upon that evidence that the court found, as a fact, that

"the testimony of each of these children in a courtroom will result in each child suffering serious emotional distress and such that each of these children cannot reasonably communicate and accordingly I believe there's a need and its [sic] appropriate to direct that the testimony of these children be provided by way of closed circuit tele-

vision consistent with the provisions of Section 9–102 . . . ."[14]

Ms. Craig seemingly ignores the thrust of this evidence, concentrating instead on the fact that the judge did not examine each child directly. In the first place, as *Wildermuth* itself makes clear, personal observation of the child by the judge is not a *sine qua non* under § 9–102. We note, however, that the court here *did* have an opportunity to observe each child prior to his or her actual televised testimony, in the context of a *voir dire* examination as to their competence. Finally, although the *Wildermuth* opinion was not available when the children testified, it was available and was considered by the court in the post-trial proceeding. We assume that, in response to Ms. Craig's challenge, the court reconsidered its recollections and impressions in light of what the Court of Appeals said was required. In summary, we find no error.

### (3) *Right Of Presence*

In addition to the confrontation issue, the *Wildermuth* Court considered the argument that the closed circuit television procedure authorized by § 9–102 violated the defendant's common law and due process right of presence in that "the witness testified in a separate room, in which he was not permitted." 310 Md. at 529, 530 A.2d 275. The Court rejected the argument, observing that the defendant "could see the witness as she testified, could hear the questions asked of her and her responses, and could communicate with his lawyer in order to convey information or suggest questions to ask." Thus, the Court held, "[t]he statutory procedure did not thwart a fair and just hearing

14. The court's statement spoke to the effect of the children's testifying "in a courtroom," which is also the focus of § 9–102(a)(1)(ii). Given the context of the issue, however—the State's motion, the evidence given by Ms. Burke and Dr. Sweeney, and the argument of counsel—it is apparent that the court's concern was not so much forcing the children to testify in open court as requiring them to testify in the direct presence of Ms. Craig. We think it evident that the finding by the court, though couched in the statutory language, addressed that concern.

in terms of due process" and there was "no violation of [the defendant's] due process right to be present." *Id.*, at 529, 530 A.2d 275. Nor, it continued, was there any violation of the common law right of presence, which had obviously been modified by the statute.

Ms. Craig seeks to distinguish her case from *Wildermuth* principally on the basis that she was "unable to communicate contemporaneously with her counsel who was in chambers with the children during their testimony." In particular, she contends that the telephone line between the courtroom, where she was sitting with co-counsel, and the judge's chambers, where counsel was present with the witness, "was sufficiently disfunctional so as to deprive [her] the constant, reliable and contemporaneous communication with her attorney...." The record does not bear that out.

The process was explained at the outset; there would be, and was, an open telephone line between counsel in chambers and Ms. Craig and co-counsel in the courtroom. Indeed, counsel specifically informed his client that, if she wanted to speak with him, "you merely talk on that telephone and that no one else is permitted to listen to that conversation." Ms. Craig's first complaint came after Brooke's *voir dire* examination as to competence. Brooke apparently let her voice drop a number of times, and Ms. Craig later said that "she could only hear part of what the child was saying." She did not ask that the examination be repeated, or indeed for any other relief.[15]

Following the *voir dire* examination, but before any testimony by Brooke, counsel complained that his co-counsel had been unable to communicate with him. The court recessed and the problem was supposedly corrected. Twice more, however, counsel complained that Ms. Craig had been

---

**15.** Counsel did ask the court to explore some other areas with Brooke, which the court declined to do, concluding that those areas did not relate to competence and suggesting that they be explored on cross-examination.

unable to communicate with him, but again no specific relief was requested. The first instance came during counsel's cross-examination of Brooke. The court instructed co-counsel to interrupt the proceeding and inform the court if the problem recurred, and counsel thereupon resumed his cross-examination, apparently with the benefit of whatever Ms. Craig wanted to tell him. Following the State's brief redirect examination, counsel again noted that his client had been unable to reach him. He said that Ms. Craig had given him several questions to ask, and he sought leave to reopen his cross-examination to ask those questions. Permission was given and the questions were asked. Indeed, the cross-examination continued for nine pages of transcript.

On this record, we fail to see any prejudice to Ms. Craig.

## IV. THERAPIST'S OPINION

Taking a brief excerpt from Ms. Burke's testimony wholly out of context, Ms. Craig urges that the court allowed Ms. Burke, who was not qualified as an expert, to render an opinion that Brooke had been the victim of child abuse. The short answer is that Ms. Burke rendered no such opinion. She was asked to describe the kind of "evaluative services" she rendered for the sexual assault center. In her response, she said that children were referred to the center because of a suspicion that they had been subjected to abuse and that

> "my job at that point would be to help make a determination through interviewing the child, working with them for a period of time, making a determination whether or not the symptoms and the behaviors that are being observed are consistent with those of a child who has been abused or assaulted."

We do not regard that statement—the one of which Ms. Craig complains—as an opinion that Brooke was subjected to abuse by Ms. Craig.

## V. REHABILITATION EVIDENCE

■■■ Ms. Craig complains here about the court's allowing Mrs. Etze and Ms. Burke to testify as to statements made to them by Brooke regarding the abuse inflicted on her by Ms. Craig. She correctly points out that, under the circumstances in which they were elicited, these hearsay statements would not be admissible as either excited utterances or fresh reports of sexual abuse and could come in only, if at all, as prior consistent statements to bolster Brooke's credibility. That, indeed, was the sole basis on which the court allowed the testimony. Ms. Craig argues, however, that the testimony was inadmissible even for that purpose because (1) Brooke's credibility had not as of then been impeached and (2) the statements at issue were not made prior to the existence of a motive to fabricate, those being the two predicate requirements under current Maryland law for the admission of a prior consistent statement. See *Finke v. State*, 56 Md.App. 450, 492, 468 A.2d 353 (1983), *cert. denied* 299 Md. 425, 474 A.2d 218, *cert. denied* 469 U.S. 1043, 105 S.Ct. 529, 83 L.Ed.2d 416 (1984); *Boone v. State*, 33 Md.App. 1, 363 A.2d 550, *cert. denied* 279 Md. 681 (1976).

The first prong of Ms. Craig's argument proceeds from the fact that, although defense counsel suggested throughout his cross-examination that Brooke had made inconsistent statements to her parents and to Ms. Burke, that she had been coached in her testimony, and that she had been subjected to disapproval or reward depending on her answers, Brooke never admitted or concurred in any of those suggestions. Positing that impeachment can come only from answers and not merely from questions, she urges that, as Brooke never admitted counsel's implied accusations, her credibility had not legally been impeached.

Although the precise issue does not appear to have been clearly decided before in Maryland (cf., however, *Finke v. State, supra,* 56 Md.App. at 493–94, 468 A.2d 353), case law elsewhere indicates that "impeachment" in this regard may

arise from the tenor of questioning alone, and even from suggestions of counsel made in argument.

In *Slater v. Baker*, 301 N.W.2d 315 (Minn.1981), the plaintiff sued a physician for malpractice, alleging his failure to treat a lump in her breast that she claimed had been made known to the defendant during an examination in 1975. The doctor denied having made any such examination and vigorously cross-examined the plaintiff with respect to that alleged examination. Although the plaintiff never retracted her testimony that the examination had occurred, she attempted to introduce testimony from four witnesses of statements made by her in 1975 that the doctor had indeed examined her breast. The appellate court held the testimony admissible on the basis that "[i]mplicit in respondent's vigorous cross-examination of appellant is the claim that she was being less than honest concerning the alleged 1975 examination." 301 N.W.2d at 319.

The California courts have allowed prior consistent statements in the face of a single question on cross-examination suggesting a motive to falsify. See *People v. Armstrong*, 275 Cal.App.2d 30, 79 Cal.Rptr. 668 (1969) (question whether witness had been promised payment for his testimony held to constitute an implication of motive to fabricate even though witness answered in the negative); and *People v. Pic'l*, 114 Cal.App.3d 824, 863, 171 Cal.Rptr. 106 (1981), *rev'd on other grounds* 31 Cal.3d 731, 183 Cal.Rptr. 685, 646 P.2d 847 (1982) (prior consistent statement admissible following question whether witness had been granted immunity coupled with evidence that no criminal charges had been filed; even though witness denied having been granted immunity, "the question to her created the implication that her testimony lacked credibility and that she had a motive to give false testimony"). See also *People v. De-Leon*, 103 Mich.App. 225, 303 N.W.2d 447, 451 (1981):

"The trial court did not abuse its discretion in allowing into evidence a prior consistent statement made by prosecution witness Garcia. Counsel for the defendant attempted to impeach witness Garcia's testimony on cross-

examination *in closing argument by implying that recent fabrication had occurred.* The prosecution was properly allowed to rebut this implication with a prior consistent statement which was made by witness Garcia." (Emphasis added.)

This rule has been applied as well in child abuse, particularly sexual abuse, cases. In *Dearing v. State,* 100 Nev. 590, 691 P.2d 419, 421 (1984), the Court affirmed the allowance of a child's prior consistent statement where defense counsel "cross-examined the child witness at considerable length with the apparent intention of implying that the child's credibility was questionable." See also *State v. Resendez,* 82 Or.App. 259, 728 P.2d 562 (1986), and *Nusunginya v. State,* 730 P.2d 172 (Alaska App. 1986).

Although some of these cases arose under Uniform Rule of Evidence 801(d)(1)(B), which Maryland has not adopted, in the context of the issue before us here, they are both relevant and persuasive. There is an element of discretion here, and that discretion must be exercised not just on the basis of what a cold record ultimately will show but rather on the basis of the trial judge's perception of what has transpired. Questions alone *can* impeach. Apart from their mere wording, through voice inflections and other mannerisms of the examiner—things that cannot be discerned from the printed record—they can insinuate; they can suggest; they can accuse; they can create an aura in the courtroom that the trial judge can sense but about which we could only speculate. The most persistent denials, even from articulate adult witnesses, may not suffice to overcome the suspicion they can engender; a child witness, and especially a child victim, may be even more vulnerable.

In ruling on Ms. Craig's objection, the court noted that the whole case generated to that point by the defendant was whether Brooke's account was accurate: "[i]s it the product of coaching, is it the product of ... being told something by the therapist...." We find no error in the court's conclusion that Brooke's testimony had been sufficiently impeached to allow the prior statements.

■  We turn then to whether Brooke's revelations to her parents and to Ms. Burke were made prior to the existence of any motive to fabricate.

In this regard, it is important to keep in mind the nature of the alleged motive to fabricate. There was no suggestion here that Brooke's testimony was based on some longstanding ill will against Ms. Craig or that it was the product of some general mendacity on Brooke's part. Nor is this a case in which, at some definable point in time, she either made a clearly inconsistent statement exculpating Ms. Craig or, by virtue of some event or agreement, acquired a previously nonexistent motive to testify against her. The point sought to be made on cross-examination and in the argument of counsel was rather that Brooke was coached into saying what she said on direct examination—that these accusations were the product of suggestion and influence on the part of her parents and Ms. Burke.

The testimony from Mrs. Etze and Ms. Burke was designed to rebut that suggestion. The thrust of it was not the particular statements made by Brooke to her mother or Ms. Burke but rather the process used with Brooke to elicit what had occurred. Both witnesses persistently denied any coaching of Brooke, or of any system of reward and punishment based on her revelations. Both denied specific and direct questioning of Brooke or suggesting what her answers should be. The statements made by Brooke, beginning in August of 1985, were relevant not because they were made *before* any motive to fabricate but to demonstrate that there *was no* motive to fabricate. The emphasis, particularly of Ms. Burke's testimony, was on the context in which Brooke revealed what had occurred—that she had been silent out of fear and that she began to open up only when made to feel comfortable and safe. The revelations at first were imprecise and hesitant; then they burst forth spontaneously.

This was a fair and proper response to the suggestions made on cross-examination. The particular statements

made by Brooke were part of that response, and, in that setting, were properly admitted.

## VI. EXCLUSION OF DR. WALDER'S OPINION

As part of her case, Ms. Craig called Dr. Leopold Walder, a clinical psychologist, to testify, based on hypothetical questions, that Brooke's responses were not within a range of what should be expected from victims of child abuse. Dr. Walder had never examined, or even talked with, Brooke, however; nor had he spoken with Ms. Burke or Brooke's parents. He had read Ms. Burke's report, referred to in Part I of this Opinion, summarizing some of the therapy sessions, and based essentially on that he seemed prepared to "present [his] professional opinion on hypotheses about why [Brooke] would say things one way or another," and whether she "reacted consistent with her statements of alleged child abuse."

Acknowledging Dr. Walder's general expertise, the court allowed him to testify "concerning the appropriateness [of] the methodology used in examining the child by [Ms. Burke]." It refused, however, to allow specific testimony concerning "the manifestations of [Brooke] to the issue of child abuse."

We find no error. As we indicated in *Waltermeyer v. State*, 60 Md.App. 69, 79, 480 A.2d 831, *cert. denied* 302 Md. 8, 485 A.2d 249 (1984):

> "[W]e have to start with the basic proposition that the admissibility of expert or opinion testimony is largely within the discretion of the trial court, subject to review on appeal, and that 'the test of admissibility of an expert's opinion should be whether his testimony will be of real appreciable help to the trier of fact in deciding the issue presented.' ... It follows from this that not every opinion of an expert is admissible, whatever its form or the source of the information upon which it is based."

(Citations omitted.) See also *Simmons v. State*, 313 Md. 33, 542 A.2d 1258 (1988).

It was evident that Dr. Walder knew no more about Brooke than what he had learned from a summary report covering some, but not all, of her therapy sessions. This alone distinguishes this case from *State v. Allewalt*, 308 Md. 89, 517 A.2d 741 (1986), upon which Ms. Craig relies. The expert there, proposing to opine that the victim of an alleged rape suffered from post-traumatic stress disorder, had examined the victim.

## VII. "OTHER CRIMES" EVIDENCE

Ruling upon the State's pre-trial motion, the court determined that three children, other than Brooke, who had attended Ms. Craig's school and had allegedly been abused by her would be permitted to testify as to what had occurred to them. Based on the proffer made by the State, the court held that their testimony qualified under a number of exceptions to the rule generally excluding "other crimes" evidence, including that tending to establish a common scheme or design and that tending to establish the identity of the perpetrator.

Pursuant to that ruling, and following *voir dire* examinations as to their competence, those children did indeed testify. Each stated that Ms. Craig had put an object into their anus.[16]

Ms. Craig challenges this testimony on three bases. First, she complains that, during the course of their own therapy, these children had made statements casting doubt on their credibility, that these statements, discovered in Ms. Burke's therapy notes, had not been disclosed to defense counsel, and, had the court been aware of those statements, it may (or would) not have found that the testimony of the children sufficed to show either a common design or identi-

---

16. One child said that she had "put something cold in my behinney." Another said that Ms. Craig had touched her "box" and her "butt," which she indicated were her vaginal and anal areas, respectively, with a stick. The third claimed that Ms. Craig "poked" his "hiney" with a "screwdriver."

ty. Having examined the material cited by Ms. Craig in the context of all the material disclosed to counsel, we find no merit at all to that complaint. Second, she points out that Jamal Craig was charged with the "same sexual child abuse" of one of the children, and that fact alone "undercuts the court's opinion" that that child's testimony demonstrated that Ms. Craig was the actor. We do not see how or why the separate charge against Jamal, as yet untried, makes the child's testimony of what Ms. Craig did inadmissible.

Finally, Ms. Craig argues that the separate indictments against her involving the other three children were "as sweeping in their time frame" as the one involving Brooke, and that it was "as unfair to Ms. Craig to defend against them as against the indictment in this case." That argument was not presented below and therefore is not properly before us now. Md.Rule 8–131.

## VIII. COMPETENCE OF TRIAL COUNSEL

As we indicated early in this Opinion, interlaced with some of the complaints made by Ms. Craig is the assertion that, by reason of various acts or omissions in the pre-trial and trial proceedings, trial counsel provided less than the minimum required level of competence, and that, as a result, she was denied the effective assistance of counsel. Her complaint in this regard centers principally on counsel's failure to obtain Ms. Burke's therapy notes and certain other material found in the files of the sexual assault center and the police and social services departments and his failure to make a proper motion to dismiss the indictment.

Although ordinarily this issue is reserved for postconviction proceedings rather than for direct appeal, here the issue was fully tried in the hearings on Ms. Craig's motions for new trial. Trial counsel testified at great length; he was asked about nearly every facet of his approach to the case, his preparation, and his trial tactics. At the conclusion of those hearings, the judge observed that, unlike the

normal postconviction setting where counsel's conduct is examined based on "some sterile transcript," he had presided at both the pre-trial and trial proceedings. With that, he declined to find counsel incompetent "as a matter of law" or that Ms. Craig "was denied a fair trial as a result of [counsel's] participation in this case." More particularly, as we previously noted, the court concluded that the mass of "newly discovered" evidence would probably not have affected the outcome of the case. The court had earlier indicated that, had it considered a motion to dismiss the indictment, it would have denied the motion.

The standard to be used in assessing the performance of counsel is that enunciated in *Strickland v. Washington,* 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1984): "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." In selecting that standard and rejecting others suggested to it, the Court observed, at 693, 104 S.Ct. at 2067:

"Even if a defendant shows that particular errors of counsel were unreasonable . . ., the defendant must show that they actually had an adverse effect on the defense.

It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding. Virtually every act or omission of counsel would meet that test . . . and not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding."

Upon the record as a whole, we are unable to conclude that the trial court's assessment of counsel's performance in the light of the *Strickland* standard was incorrect. As we indicated in Part I, the "newly discovered" material presented at the post-trial hearings would not likely have changed the ultimate verdicts rendered by the jury. As to pressing a proper motion to dismiss the indictment, we observe that (1) counsel did obtain a good bit of detailed

information as to the acts allegedly committed by Ms. Craig through the discovery process, (2) under the caselaw prevailing at the time, it is not at all clear that the broad time period alleged made the indictment defective, and (3) to the extent the court might have found fault with the indictment, the State would probably have been in a position to correct the fault. No claim has been made of any actual prejudice, i.e., of any inability to respond to the charges based on the evidence presented at trial.

JUDGMENTS AFFIRMED; APPELLANT TO PAY THE COSTS.