768 P.2d 150

**STATE of Arizona, Appellee,**

v.

**Gerald Dean VINCENT, Appellant.**

**No. CR–87–0001–AP.**

Supreme Court of Arizona,
En Banc.

Jan. 19, 1989.

Robert K. Corbin, Atty. Gen. by William J. Schafer, III, Chief Counsel, Crim. Div. and John B. Barkley, Paul J. McMurdie, Asst. Attys. Gen., Phoenix, for appellee.

Jim D. Himelic, Tucson, for appellant.

FIDEL, Judge.

Gerald Dean Vincent was convicted of murder in the first degree and sentenced to life imprisonment without release for twenty-five years. The murder victim was his estranged wife.

We reverse because we conclude that Vincent's state and federal constitutional right to confront adverse witnesses was violated by the state's videotaped presentation of the testimony of his minor children.

The United States Supreme Court has recently addressed the constitutional validity of statutory efforts to shield child witnesses from the confrontational rigors of courtroom testimony. *Coy v. Iowa,* —— U.S. ——, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988). We review Arizona's child witness statute, A.R.S. §§ 13–4251 to –4253 (Supp. 1988), in light of the Supreme Court's *Coy* decision. We determine that the statute is capable of constitutional application, and we elaborate on means of constitutional application for the guidance of Arizona's courts. However, we also determine that the statute was unconstitutionally applied in the present case, where the state was permitted to shield the Vincent children from face-to-face confrontational testimony without making an individualized showing that either of them needed such protection.

Although the confrontational error is dispositive, we also discuss an incident of prosecutorial misconduct during final argument. The offending argument concerned state's witness Stephen Calaway, a jailmate of defendant, who testified that the defendant had confessed the murder to him. Calaway testified pursuant to a highly favorable plea bargain with the state, and defendant's counsel attacked his credibility. The prosecutor responded in final argument by vouching for the honesty of Calaway's testimony. We consider and reject the state's contention that the prosecutor's comments were invited, and we reiterate our repudiation of such tactics.

## I. THE EVIDENCE

Donna Vincent was murdered in her home on the night of January 23, 1986. Her body was discovered by Jarred, the Vincents' six year old son, sometime in the middle of the night. Unable to awaken Kristy, his eight year old sister, Jarred returned to bed until approximately 6 a.m. In the morning, Kristy immediatley reported the death by telephoning the 911 emergency number. According to the pathologist, the cause of death was blood loss as a consequence of stabbing.

Gerald Dean Vincent, the husband of Donna Vincent, lived apart from his family at the time of his wife's death, but had visited them on the evening of January 23. He is the last person known to have seen the victim alive.

At trial, the prosecutor presented the testimony of Jarred and Kristy. The children testified only by videotape; they did not appear at trial. Neither claimed to have witnessed the murder, but both made statements that tended in part to incriminate their father. The taping was arranged so that Vincent could see and hear the children from a separate room but they could not see or hear him. While the defendant's attorney and the prosecutor questioned the children, defendant had telephonic access to his attorney.

Jarred Vincent testified that he had watched TV with his sister and father until bedtime on January 23. Later he heard his parents fighting:

The Prosecutor: Jarred ... after you first went to bed, could you hear your mom and dad at all?

A: Yes.

Q: What were they doing?

A: They were fighting.

. . . .

Q: [T]hey were fighting.

A: Uh-huh, they were yelling.

. . . .

Q: Could you hear what they were arguing about?

A: No.

Still later Jarred awakened, left his room, and entered the living room, where he saw his mother lying on the floor cover-

ed with a "red violet" towel. He was unable to waken his sister until morning. Then, according to Jarred, as Kristy spoke to the 911 operator, the defendant returned to the house and almost tripped over the body of his wife. Jarred stated that his father wore the same clothing in the morning that he had worn the night before. Jarred acknowledged to defense counsel that he had not seen the murder.

Defense Counsel: The night that something bad happened to your mommy you didn't see anything, did you?

A: No.

Kristy Vincent's recollections were similar. Although at one point Kristy testified that her father did *not* trip over her mother's body on the morning after the murder, she later stated, "he may have almost" done so. Kristy was unable to testify definitively whether her father was wearing the same clothes in the morning as he had worn the night before. Kristy told the 911 operator that her father had stabbed her mother. However, Kristy, like Jarred, testified that she did not know who had killed her mother and that she had not witnessed the actual killing.

Defense Counsel: You don't know what happened to your mom other than that you discovered her, right, that you found her?

A: Yes.

Q: You don't know who did that to your mom?

A: No.

. . . .

Q: Okay. And you slept that whole night and you never saw what happened to your mom.

A: No.

At approximately 6 o'clock on the evening of Janaury 23, 1986, before Donna Vincent's murder, defendant went to his cousin John Schull's motel room to discuss the Vincents' impending divorce. According to Schull, both he and Vincent had arrived "around 6 in the evening." Schull testified that he and Vincent had remained together in the room for approximately 40–45 minutes and that the manager of the motel had joined them for approximately 15 minutes; Schull was not certain whether he and Vincent had left the motel at the same time. Schull visited several bars with a friend that night and did not return until 4 a.m. on January 24. There, he said, he found defendant asleep and the room full of gas fumes. Schull awakened defendant, who stated that he needed to return to his wife's trailer. Schull testified that defendant had changed his clothes from the night before and that a broken plate, which he had last seen in a trash bag, was now stacked on the floor. Schull testified that he commented on the bag's absence and that defendant responded that he had needed the bag but gave no further explanation. Schull accompanied defendant to Donna Vincent's mobile home, but they traveled in separate cars. Schull stated that he did not enter the home, but that, as defendant entered, he heard Kristy scream out: "Daddy, why did you have to kill her?"

Vincent entered while Kristy was speaking with the 911 operator. He took the phone, and his comments, like Kristy's, were tape recorded. Vincent told the 911 operator that he had left his wife's trailer between 7:15 and 7:30 on the evening of her death and that he had just returned to take the children to school. Both Kristy and Jarred testified that their father had watched the TV show "Silver Hawks" with them and had afterward tucked them into bed. The parties stipulated that "Silver Hawks" aired from 7 to 8 p.m.

Both Jarred and Kristy testified on direct examination that they neither saw nor heard their father leave the trailer after they had gone to bed. In response to defense counsel's questioning, however, Kristy stated that she had heard her father's car drive away.

According to the pathologist's estimate, Donna Vincent's death might have occurred as early as 7 to 9 p.m. or as late as 1 a.m. The children's evidence placed the defendant in a quarrel with the victim in her home at a time within the pathologist's approximate period of death. If Schull's testimony were believed over Jarred's, the fact that the defendant changed clothes

during the night and emptied a trash bag to employ it for an undisclosed purpose permitted the inference that he sought to conceal evidence of crime. The testimony that he was found in a gas-fume-filled motel room likewise permitted the inference of a guilty mind. Though such evidence cumulatively constituted a circumstantial case of guilt, it was augmented considerably by the accusations of Stephen Calaway.

Calaway had been a "pod-mate" of defendant in the jail where defendant was incarcerated before trial. Calaway testified that on numerous occasions he had heard defendant brag about the murder. On one occasion, Calaway said, defendant had demonstrated the manner of the killing; on another, defendant drew a picture of the murder weapon on a book from the prison library. According to Calaway, Vincent told him that his little girl had caught him during the act; defendant complained that Kristy saw him with "blood on him" only because his "cousin John [Schull] was supposed to be a lookout and watching the children, and he ... didn't do a good job." Calaway stated that on several occasions when defendant had talked about or demonstrated the murder, Walter Johnston, another pod-mate, had been present. Calaway added on cross-examination that Vincent was not alone in admitting a murder to him; he testified that Johnston had admitted a separate murder and that he had reported Johnston's admission to the state as well. (Johnston, called as a witness, pled the Fifth Amendment and refused to testify on this or any subject.)

At the time of Vincent's trial, Calaway faced prosecution on a multitude of charges that exposed him to a maximum prison term of 124.5 years, at least two thirds to be served before parole. In re-

turn for his testimony against Vincent, however, Calaway had entered a plea agreement that reduced his maximum prison exposure to ten years, only one half to be served before parole, and that extended him the possibility of probation.[1] The plea agreement had not yet been accepted by the court.

During cross-examination, defense counsel attempted to impeach Calaway's credibility with questions relating to the highly favorable nature of this plea agreement. The following exchange occurred:

Q. And as part of the agreement, you've agreed to give truthful testimony?

A. That's correct.

Q. Truthful to who, according to who?

A. To myself and everybody else listening.

Q. Does truthful mean favorable testimony, Mr. Calaway?

A. Means truthful.

Q. Does it mean favorable?

A. No.

The prosecutor did not object.

In closing argument, defense counsel attacked Calaway's credibility:

Then there is Mr. Calaway's desire for lenient treatment. Another desire on his part.

And his desire for lenient treatment I submit to you is paramount to everything, including the truth, including the truth.

You heard what negotiations were. You heard what the deal was that Calaway got. Probation available. Probation available.

When is he going to get sentenced? He's to be sentenced after he testifies.

---

1. Calaway had been charged with six counts of aggravated assault, all class 3 felonies. Each was charged as a dangerous offense, a sentence enhancing allegation, and the state had the option of seeking further sentence enhancement by alleging that Calaway had two or more prior felony convictions. Additionally, Calaway was charged with one count of possession of a deadly weapon by a prohibited possessor, a class six felony, as to which the state likewise had the option of seeking enhancement by alleging prior

convictions. Defense counsel introduced evidence that Calaway's maximum exposure if convicted, given a fully aggravated sentence, and given a consecutive sentence on each count, was 124.5 years. The plea agreement reduced the charges to two counts of aggravated assault, eliminated dangerous nature and prior felony allegations, left Calaway probation-eligible, and provided that any sentences would be concurrent.

And he's going to give truthful testimony. That's part of the negotiations.

Truthful according to who? According to who?

The prosecutor again made no objection.

Continuing his attack, defense counsel questioned the state's failure to investigate John Schull, the defendant's cousin, whom Calaway had implicated as the "lookout" during Donna Vincent's murder:

> One thing I found interesting too is that if this Calaway is a believable character, do you see any investigation of cousin John [, whom] Calaway gets on the stand and says was a lookout? Do you see any investigation of cousin John?
>
> . . . .
>
> If Calaway is such a believable person, why isn't cousin John being prosecuted? Calaway got on the stand and said, hey, cousin John was there.
>
> It's because he's an unbelievable person.

Again the state made no objection. Defense counsel likewise questioned the state's failure to pursue Calaway's attribution of a separate murder to Johnston:

> And it's interesting to note that allegedly not only Gerald Vincent but Walter Ray Johnston just happens to bare his soul to Mr. Calaway, two people. And the reason that Mr. Calaway comes up with two people is he's in a predicament and he's got to say something. So he's got two people for leverage to bargain his case.
>
> And it is interesting to note also that no Deputy County Attorney has ever talked to Mr. Calaway on the Johnston case. Why is that?

The state did not object to any of these attacks on the credibility of Calaway. Nor had it objected during trial to the admission of evidence that the state had not investigated Calaway's accusations against Schull and Johnston. During rebuttal argument, however, the prosecutor vouched for Calaway's credibility with the following statement:

> But I can absolutely assure you of one thing, and that's the kind of remarks [defense counsel] made, *the State wouldn't have put Mr. Calaway on the witness stand if they didn't believe every word out of his mouth about the conversations he had.*

(Emphasis added.)

Defense counsel immediately objected. The objection was sustained and the remark stricken. Undaunted, the prosecutor reiterated the state's belief in Calaway:

> If Mr. Bock is going to suggest to you somehow or another a disbelief in the State's case or the State's witnesses, that's not so.

Defense counsel moved for mistrial; the trial court denied it. Following conviction, defendant appealed.

## II. PROSECUTORIAL VOUCHING

We preliminarily consider the issue of prosecutorial misconduct. We do so in order to discuss the state's position that its vouching comments were invited.

Our court of appeals has described two forms of impermissible prosecutorial vouching: (1) where the prosecutor places the prestige of the government behind its witness; (2) where the prosecutor suggests that information not presented to the jury supports the witness's testimony. *State v. Salcido*, 140 Ariz. 342, 344, 681 P.2d 925, 927 (App.1984) (quoting *United States v. Roberts*, 618 F.2d 530, 533–34 (9th Cir. 1980)).

Both forms are apparent in this case. When the prosecutor argued that "the State wouldn't have put Mr. Calaway on the witness stand if [it] didn't believe every word out of his mouth," he placed his personal opinion and the weight and prestige of the County Attorney's office behind the witness. Moreover, he suggested by his comment that the state had some unrevealed basis to give Calaway credence.

The state concedes the impropriety but argues that its comments were a tolerable response to defense counsel's "opening salvo." A vouching response was "invited," the state suggests, when defense counsel attacked Calaway's credibility by remarking that if Calaway had been believable,

the state would have investigated his accusations against Schull and Johnston.

■ The invited comment doctrine applies when counsel for one party "argues improperly, provoking the [other] to respond in kind, and *the trial judge takes no corrective action.*" *United States v. Young*, 470 U.S. 1, 11, 105 S.Ct. 1038, 1044, 84 L.Ed.2d 1, 9 (1985) (emphasis added). The doctrine neither invites nor condones avowals to the jury of counsel's personal beliefs. *State v. Woods*, 141 Ariz. 446, 455, 687 P.2d 1201, 1210 (1984). In *Woods*, we stated that when counsel's personal beliefs are unfairly attacked, "[t]he proper remedy for such a serious error ... is objection, motion to strike, and an instruction ... that the jury should disregard the improper comment." *Id.*

We do not find defense counsel's "opening salvo" improper. Calaway's plea agreement exposed his credibility to vigorous attack, and the state did not object to testimony that it had declined to pursue Calaway's charges against Johnston or Schull. But even if defense counsel's argument were improper, it would have invited only an objection and a request for curative instruction. *Id.* The state chose not to object. It gave the trial judge no occasion to consider corrective action. Instead the prosecutor awaited rebuttal to express the state's confidence in Calaway. This was wholly inappropriate.

■ The Supreme Court's decision in *Young* does not validate such conduct. The "invited response" doctrine does not condone "response-in-kind that inevitably exacerbates the tensions inherent in the adversary process." *Young*, 470 U.S. at 12, 105 S.Ct. at 1045, 84 L.Ed.2d at 10. Nor does it condone withholding objection in favor of improper self-help. It merely encourages a reviewing court to assess whether "the prosecutor's 'invited response,' taken in context, unfairly prejudiced the defendant." *Id.*

The state discounts the question of prejudice, claiming that its prosecutor's comments constituted harmless error at worst. We cannot be so sanguine. There were no eyewitnesses to this crime. Though there was inculpatory circumstantial evidence, Calaway's testimony was the only direct evidence against the defendant. Calaway testified that defendant admitted the murder and related many of its details. Yet Calaway testified pursuant to a highly advantageous plea agreement, and his testimony conflicted with other evidence in a number of respects.[2] In short, Calaway was a highly significant witness but with credibility highly flawed. The state, obliged to let his testimony stand or fall on its own merits, resorted instead to improper vouching for a bolstering effect.

Did the state's comments sway the jury on the subject of Calaway's credibility, and, if so, did they affect the verdict? The test for prejudicial error is stated in *State v. McVay:*

> The question is not whether, absent the error, there were sufficient facts from which the jury *could* find the defendant guilty, the question is whether, without this evidence, the appellate court can say, beyond a reasonable doubt, that the jury *would* have found the defendant guilty.

127 Ariz. 450, 453, 622 P.2d 9, 12 (1980) (emphasis added).

We need not apply this test in the case at hand. The dispositive confrontation clause issue relieves us from determining the likelihood that the jury was affected by the state's remarks. We take this occasion, however, to reiterate our condemnation of prosecutorial vouching, to emphasize that it is neither an invited nor an acceptable response, and to caution that, when the state resorts to vouching for the credibility of a witness, it seriously jeopardizes the validity of the conviction that it seeks.

**2.** Calaway claimed that defendant had told him that his daughter had seen him kill his wife; both children denied seeing the murder. Calaway testified that, according to defendant, Donna was pregnant at her death; the evidence at trial not only indicated the contrary, but showed that Donna had undergone a tubal ligation and was incapable of conceiving. Calaway claimed that defendant told him that his cousin John Schull had acted as a lookout; Schull, a state's witness, denied it.

## III.  VIDEOTAPED TESTIMONY

We turn to the violation of defendant's confrontational rights by the introduction of the videotaped testimony of his children.

A.R.S. sections 13–4251 to –4253 (Supp. 1988) apply to "the testimony or statements of a minor in criminal proceedings involving acts committed against the minor or involving acts witnessed by the minor...." A.R.S. § 13–4251(A). Section 13–4253 provides in part:

> B.  The court, on motion of the prosecution, may order that the testimony of the minor be taken outside the courtroom and be recorded for showing in the courtroom before the court and the finder of fact in the proceeding.  Only those persons permitted to be present at the tak ing of testimony under subsection A may be present during the taking of the minor's testimony, [the attorneys for the defendant and for the state, persons necessary to operate the equipment and any person whose presence would contribute to the welfare and well-being of the minor] and the persons operating the equipment shall be confined from the minor's sight and hearing as provided by subsection A.  The court shall permit the defendant to observe and hear the testimony of the minor in person but shall ensure that the minor cannot hear or see the defendant.  The court shall also ensure that:
>
> 1.  The recording is both visual and aural and is recorded on film or videotape or by other electronic means.
>
> 2.  The recording equipment was capable of making an accurate recording, the operator was competent and the recording is accurate and is not altered.
>
> 3.  Each voice on the recording is identified.
>
> 4.  Each party is afforded an opportunity to view the recording before it is shown in the courtroom.
>
> C.  If the court orders the testimony of a minor to be taken pursuant to this section, the minor shall not be required to testify in court at the proceeding for which the testimony was taken.

Applying the statute, the trial court permitted Kristy and Jarred Vincent to testify by videotape.  During the taping session, only the trial judge, the prosecutor, the defense attorney, and the children's foster mother were present with the witnesses. Although defendant could see and hear the witnesses, he was stationed in a separate room so that the children could not see or hear him.  Over defendant's objection, the trial court permitted this videotaped testimony to be presented to the jury.  Defendant claims that this procedure constituted reversible error for several reasons.

### A.  Whether the Children Qualify as Witnesses

■   Defendant bases his first argument on his interpretation of A.R.S. § 13–4251(A), which states: "This article applies to the testimony or statements of a minor in criminal proceedings involving acts committed against the minor or involving *acts witnessed by the minor...*." A.R.S. § 13–4251(A) (emphasis added).  Citing this statute, defendant argues that the Vincent children were neither eyewitnesses nor victims within the meaning of the statute.

We disagree.  The legislature sought by the enactment of § 13–4251 *et seq.* to reduce—to the extent constitutionally permissible—the trauma of criminal testimony for minor witnesses.  We find no basis in that purpose or in the phrase "acts witnessed by a minor" to restrict the protection of the statute to witnesses of culminating criminal acts and deny it to witnesses of circumstantially relevant events.  Application of the statute does not turn on the criminality of the witnessed act but rather on the likelihood and extent of testimonial trauma for the witness.

The Vincent children gave material testimony concerning their father's activities at their home on the night of January 23 and on the morning of January 24.  The trial court correctly found that they were witnesses as required by § 13–4251(A).

### B.  The Constitutionality of Substituting Videotaped for Face-to-Face Testimony

Defendant next argues that the trial court unconstitutionally permitted the state

to substitute the videotaped testimony of his children for face-to-face confrontational testimony in open court. He argues that A.R.S. § 13–4253, the authorizing statute, was unconstitutional both as applied and on its face. We address each of these arguments, but first set forth the procedural history of the authorization of videotaping in this case.

### 1. Procedural History

On June 26, 1986, the state moved to record the children's testimony pursuant to A.R.S. § 13–4253. Defendant's first attorney, Hector Estrada, did not object. Judge Fahringer granted the motion, and the children were videotaped; however, the tape proved inaudible and useless. When a motion to retape the children was argued to Judge Arnold on July 8, Mr. Estrada responded that, although he thought he had a legal basis to object, he had informed the defendant and the defendant had gone along with the videotaping for the children.

Following Mr. Estrada's withdrawal as defense counsel and the appointment of Richard C. Bock, the defendant moved for a rehearing of the state's motion to record the children's testimony. On September 12, 1986, Judge Arnold heard the motion and considered the likelihood that the children would suffer severe emotional or mental distress if required to testify at trial. Following argument by counsel, but without presentation of evidence, he stated that

> children ... of such tender age ... could be traumatized due to the severe nature, [and] severity of the crime charged and ... it would be in the best interests of the children that they not be called to look upon the face of their father while

they are being asked the questions involving this incident.

> And I think that it is perfectly permissible and probably should and will be arranged so that Mr. Vincent can see the children but they can't see him during the testimony.

Thus, the motion to record the children's testimony was granted.

The second videotaping took place on November 10, 1986. Present were the prosecutor, the defense attorney, the foster mother, and Judge Collins, who by then had been designated trial judge. By its terms, A.R.S. § 13–4253(A) permits "[o]nly the attorneys for the defendant and for the state, persons necessary to operate the equipment and any person whose presence would contribute to the welfare and well-being of the minor" to be present in the room with the minor during the testimony. Neither party suggested that this language precluded the presence of the judge. To the contrary, the parties stipulated to his presence. The children were introduced to the judge before the taping began. The judge stated that he would sit on alternate sides of the room to avoid an appearance of bias. Defense counsel stated on the record that he had no problem with this manner of taping; however, he reiterated his constitutional objection to the taping *per se* and to the admission of the videotape at trial.

At a hearing on other matters on November 14, 1986, the trial judge informed counsel that he had received a letter from the Foster Care Review Board dated November 5, 1986, in which the Board recommended that the testimony of the children be videotaped to avoid psychological damage from testifying at trial.[3] Judge Collins advised

---

**3.** This letter stated in full:

The Foster Care Review Board has reviewed the case of Kristy and Jared [sic] Vincent, J# 89417, regarding their current placement and general welfare. The caseworker Daisy Carroll has revealed that the foster home is very supportive and nurturing of the children, but that counseling is slow due to many upheavals in the children's lives resulting from legal proceedings in the father's impending trial.

This board unanimously feels that Kristy and Jared [sic] would suffer further psycho-

logical damage if allowed to testify at their father's trial. Indirect testimony via video tape, tape recordings or any other vehicle would be highly recommended.

The emotional and psychological welfare of two very young children is at stake and we wish to express our concerns in their behalf. We understand the seriousness of Mr. Vincent's charges, but we feel very strongly that the children need to be protected from further experiences that can cause irrevocable social damage.

counsel that he would place the letter in the court file "so people would know when it was prepared and what happened." He did not indicate, however, that the letter had affected the court's decision. To the contrary he stated, "Decision was made before I got the letter and made by another judge, even." On November 25, 1986, Judge Collins permitted the videotape to be shown to the jury.

Defendant argues that the admission of videotaped testimony in lieu of live testimony by the Vincent children violated his confrontational rights under the Sixth Amendment of the U.S. Constitution and under article II, § 24 of the Arizona Constitution. The state submits that defendant waived this argument at trial when his counsel asserted his intention to employ the tape even if the state did not.

We disagree with the state's assertion. The defendant repetitively and clearly argued on constitutional grounds against the substitution of taped for live testimony; he took this position before the second, usable taping session was permitted and maintained it until the tapes were introduced. That the defendant may have wished to use the tapes for exculpatory purposes did not vitiate his argument that they could not be constitutionally substituted for the face-to-face courtroom testimony of the children. We turn to the merits of defendant's constitutional challenge.

## 2. The Absence of Individualized Findings

Although defendant attacks the taping provisions of A.R.S. § 13–4253 as incapable of constitutional construction, we first consider the narrower question whether the statute was constitutional as applied. In answering this question, we are guided by a decision issued by the United States Supreme Court during the pendency of this appeal: *Coy v. Iowa,* —— U.S. ——, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988). In *Coy,* the Court considered an Iowa statute that permitted child witnesses to testify behind a screen or mirror to block their view of the accused. Coy was charged with assaulting two thirteen-year-old girls as they

slept in a tent in their backyard. Taking no evidence and making no finding that the victims were unable to testify in Coy's presence, the trial court applied the statute and permitted the witnesses to testify in the courtroom behind a screen. Because of special lighting effects, the defendant could dimly view the witnesses, but the witnesses could not see him. The United States Supreme Court found this an "obvious [and] damaging violation of the defendant's right to a face-to-face encounter." *Id.* at ——, 108 S.Ct. at 2802, 101 L.Ed.2d at 866.

The state argued in *Coy* that the "confrontation interest at stake ... was outweighed by the necessity of protecting victims of sexual abuse" and that the statute at issue had created a "legislatively imposed presumption of trauma" for child abuse victims. *Id.* at ——, 108 S.Ct. at 2802–03, 101 L.Ed.2d at 866–67. Finding no merit in this argument, the Court reversed, holding that, because there were "no *individualized findings that these particular witnesses needed special protection,* the judgment ... could not be sustained by any conceivable exception." *Id.* at ——, 108 S.Ct. at 2803, 101 L.Ed.2d at 867 (emphasis added).

Prior to the issuance of *Coy,* the Arizona Court of Appeals, under similar circumstances, held that A.R.S. § 13–4253 violates the confrontation clauses of both the federal and state constitutions. *State v. Vess,* 157 Ariz. 236, 756 P.2d 333 (App. 1988). In *Vess,* the prosecutor had moved pursuant to § 13–4253(A) that the testimony of the child allegedly victimized by defendant be taken in another room and transmitted by closed circuit television to the courtroom for the jury. The trial court granted the motion without requiring a showing or making a finding that the witness needed such protection. The *Vess* court reversed, observing that, if § 13–4253(A) were interpreted to spare the state the burden of proving a witness's particularized need, "[i]n effect, the legislature [would have] created a class of prosecution witnesses in criminal trials who need not testify before the jury if the prosecutor does not want them to, whether or not any

reason exists for allowing testimony to be taken in that form." *Id.* at 237, 756 P.2d at 334. In *Vess*, not even a generalized finding of need was made. Simply because the statute permitted a child to testify in this manner, the procedure was adopted. The court held that § 13–4253, so applied, was unconstitutional under both the federal and state constitutions. *Id.* The court stressed that, although "[t]he demands of the confrontation clause are not absolutes ... [e]xceptions ... may be made only on a showing of ... *particularized need....*" *Id.* at 238, 756 P.2d at 335 (emphasis added).

Vincent, like Coy and Vess, was denied face-to-face confrontation with the witnesses against him. In support the state relied on a generalized assertion that any minor child directed to testify against a father would be traumatized by a face-to-face encounter. On September 12, 1986, at the hearing on the reconsideration of the state's motion to permit videotaped testimony, the trial judge stated that children "of such tender age ... *could* be traumatized" by face-to-face testimony and that it would serve their best interests not to "look upon the face of their father" when questioned about events surrounding the murder. The trial court based its findings, not on the particularized circumstances of Kristy and Jarred, but rather on the presumed best interests of children of their ages and on the fact that defendant was their father. The state offered no evidence and the judge considered none in making this determination. *Coy* teaches that so generalized an assumption is no substitute "for individualized findings that these particular witnesses needed special protection." ── U.S. at ──, 108 S.Ct. at 2803, 101 L.Ed.2d at 867.

The state argues, however, that the particularized needs of the Vincent children were demonstrated by the letter from the Foster Care Review Board. In this letter, the members of the Board expressed their concern for the emotional and psychological welfare of the Vincent children and unanimously recommended that their testimony be videotaped in a manner to protect them from facing their father.

We begin by observing that the letter played no part in the decision by Judge Arnold that the best interests of the children required protection from a face-to-face testimonial encounter. The letter was not sent until two months after he had made that determination.

Second, the letter was not accepted by the trial court as evidence, but was merely filed as a record of correspondence pertaining to the case. Moreover, even if the letter had been offered into evidence, it would not have withstood timely objection.[4]

Third, putting aside evidentiary concerns and assuming that the letter might have been considered as a retroactive bolster to Judge Arnold's decision to admit the videotape at trial, it did not supply the missing ingredient of "particularized need." *Vess*, 157 Ariz. at 238, 756 P.2d at 335. It offered no specific evidence concerning the likely impact of courtroom testimony on Kristy or Jarred. The Board expressed an understandable concern that the trauma to the children be minimized. But in taking the further step of recommending videotaping, the Board, like the trial court, appears to have drawn a generalized conclusion, based upon the assumption that testimony under such circumstances would be traumatic to any child, rather than an individualized assessment of the ability of each Vincent child to testify in open court.

*Coy* and *Vess* both tell us at a minimum that such generalized conclusions do not suffice to justify a substitute for face-to-face confrontational testimony. Because

---

**4.** Nothing about the Foster Care Review Board letter satisfied the conditions for self-authentication, Rule 902, 17A A.R.S. Rules of Evidence; nor did it self-evidently meet the requirements of the "public record or report" exception to the hearsay rule, Rule 803(8), 17A A.R.S. Rules of Evidence. Its authors did not appear in court so that the foundation for their conclusions might be probed. Nor did the letter reveal the basis for the Board's conclusions. Although the letter expressed concern that the children might experience psychological damage if they testified, the authors revealed neither expertise nor personal observations from which such conclusions might be drawn.

there were no particularized findings concerning the comparative ability of the Vincent children to withstand the trauma of face-to-face testimony, as contrasted with the trauma of a videotaped procedure with their father shielded from their view, we hold that A.R.S. § 13–4253 was applied in such a way as to violate the defendant's constitutional right to confrontation. Because the videotaped testimony of the Vincent children was improperly admitted and was instrumental in securing the conviction of the defendant, we conclude that the judgment must be reversed.

3.  Is § 13–4253 Susceptible to Construction as Requiring Individualized Findings of Necessity?

The trial court assumed that A.R.S. § 13–4253 embodied a presumption that child witnesses should be accommodated with a substitute for confrontational testimony in the courtroom. No particularized showing of necessity was required. We have followed *Coy* and *Vess* in holding the statute unconstitutional so applied.

For the guidance of the trial court upon remand, we turn to the broader question raised by defendant: whether the statute is capable of constitutional construction.[5] We divide this question into two. The first and narrower question is whether the statute may be construed as permitting videotaped testimony only upon an individualized showing of necessity. If the statute could not be construed to require such a finding, which *Coy* tells us is a constitutional threshold requirement, we would be obliged to hold the statute unconstitutional on its face.

■ We find no difficulty in upholding A.R.S. § 13–4253 on this ground. Although it does not explicitly require a finding of necessity, the statute implicitly does so. It is cast in permissive rather than

mandatory language, requiring the trial court to exercise discretion in its use.

The court, on motion of the prosecution, *may* order that the testimony of the minor be taken outside the courtroom and be recorded for showing in the courtroom before the court and the finder of fact in the proceeding.…

A.R.S. § 13–4253(B) (emphasis added). Although the statute does not indicate what factors bear on the trial court's decision, it necessarily contemplates that the trial judge will exercise discretion in accordance with the state and federal constitutions. Thus, we hold, section 13–4253(B) requires the trial judge to condition the substitution of videotaped testimony for live testimony upon an individualized showing of necessity.

4.  Beyond *Coy*: Will Individualized Findings Suffice?

We turn to a second and harder question that is highlighted but unresolved in *Coy:* May even an individualized showing of probable trauma to a child witness justify abridgment of the defendant's constitutional right to a face-to-face courtroom encounter? We take up this question to guide the trial court upon remand and to assist future courts in applying A.R.S. § 13–4253.

*Coy* leaves the answer in some doubt. Justice Scalia, joined in the Court's opinion by five other justices,[6] wrote:

[T]here is something deep in human nature that regards face-to-face confrontation between accused and accuser as 'essential to a fair trial in a criminal prosecution.'

— U.S. at ——, 108 S.Ct. at 2801, 101 L.Ed.2d at 865.

Stressing the importance of confrontation to the truth-seeking process of a trial, he continued:

---

5.  We assume in addressing this question that the statute permits a judge to be present at any taping conducted under its auspices, a procedure the trial court followed in this case in order to assure the neutrality and fairness of the taping. We do not address the interpretative or constitutional validity of reading the statute to exclude the judge.

6.  Two of the six participants in the majority opinion, Justices O'Connor and White, elaborated on their views in a separate concurrence, which we discuss *infra*. Justice Blackmun filed a dissenting opinion in which Chief Justice Rehnquist joined. Justice Kennedy did not participate.

The State can hardly gainsay the profound effect upon a witness of standing in the presence of the person the witness accuses, since that is the very phenomenon it relies upon to establish the potential 'trauma' that allegedly justified the extraordinary procedure in the present case. *That face-to-face presence may, unfortunately, upset the truthful rape victim or abused child; but by the same token it may confound and undo the false accuser, or reveal the child coached by a malevolent adult.* It is a truism that constitutional protections have costs.

*Id.* at ——, 108 S.Ct. at 2802, 101 L.Ed.2d at 866 (emphasis added).

Justice Scalia acknowledged that certain rights implicit in the Confrontation Clause —the right to cross-examine and to exclude out-of-court statements, for example—were not absolute and might give way to other important interests. But this, he wrote,

is not the same as holding that we can identify exceptions, in light of other important interests, to the irreducible literal meaning of the clause: 'a right to *meet face to face* all those who appear and give evidence *at trial.*' *California v. Green,* 399 U.S. [149,] 175, 90 S.Ct. [1930,] 1943–44, [26 L.Ed.2d 489, 506 (1970)] (Harlan, J., concurring) (emphasis added). We leave for another day, however, the question whether any exceptions exist. Whatever they may be, they would surely be allowed only when necessary to further an important public policy.

*Id.* at ——, 108 S.Ct. at 2803, 101 L.Ed.2d at 867 (emphasis in original).

Though the Court's opinion left the question of exceptions unsettled, two of the six participants in that opinion were willing to address it. Justice O'Connor, joined by Justice White, wrote in separate concurrence:

I would permit use of a particular trial procedure that called for something other than face-to-face confrontation if that procedure was necessary to further an important public policy.... The protection of child witnesses is, in my view and

in the view of a substantial majority of the states, just such a policy. The primary focus therefore likely will be on the necessity prong. I agree with the Court that more than the type of generalized legislative finding of necessity present here is required. But if a court makes a case-specific finding of necessity, as is required by a number of state statutes, ... our cases support that the strictures of the Confrontation Clause may give way to the compelling state interest of protecting child witnesses.

*Id.* at ——, 108 S.Ct. at 2805, 101 L.Ed.2d at 869–70 (O'Connor, J., concurring).

The majority and concurring opinions in *Coy* highlight two competing principles, both of them deeply held. As Justice O'Connor observes, the protection of child witnesses is an important public policy; society has a natural concern to spare children the unnecessary rigors of appearance at trial. Yet, as Justice Scalia points out, the rigor of a face-to-face encounter between witness and accused has a fundamental function in the truth-discerning process. It impresses the witness with "the seriousness and solemnity of the occasion," *Wildermuth v. State,* 310 Md. 496, 513, 530 A.2d 275, 283 (1987), and aids the fact-finder in distinguishing the false accuser from the true, the uncertain from the sure.

These competing objectives cannot be wholly reconciled. To whatever extent the law insists on face-to-face confrontation, it heightens the anxiety, and perhaps the trauma, of those who are willing to bear witness against crime. Yet "a witness's reluctance to face the accused may be the product of fabrication rather than fear or embarrassment." *Wildermuth,* 310 Md. at 511, 530 A.2d at 282 (quoting *Herbert v. Superior Court,* 117 Cal.App.3d 661, 671, 172 Cal.Rptr. 850, 855 (1981)). To whatever extent the law cushions a witness against the crucible of confrontation, it diminishes a fundamental courtroom test of truth.

Into this thicket of competing values and objectives, we step partway today. Our guidepost is the witness unavailability standard of *Ohio v. Roberts,* 448 U.S. 56, 100

S.Ct. 2531, 65 L.Ed.2d 597 (1980), as applied in *State v. Robinson,* 153 Ariz. 191, 735 P.2d 801 (1987), and in two recent decisions of the Maryland courts.

We begin by examining the conclusion of the Court of Special Appeals of Maryland in a case decided after *Coy:*

> Where a face-to-face meeting would, in fact, so traumatize a child-witness as to prevent him or her from reasonably communicating, the State may provide for that testimony to be taken in a setting that, as nearly as practicable, preserves all other aspects embodied in the right of confrontation, but does not require the witness to look directly upon the defendant or to testify in his direct physical presence.

*Craig v. State,* 76 Md.App. 250, 280, 544 A.2d 784, 799 (1988).

The Maryland statute interpreted in *Craig* provided for the closed circuit telecast of a child witness's testimony to the courtroom upon judicial determination that testimony in open court would "result in the child suffering serious emotional distress such that the child cannot reasonably communicate." Md.Cts. & Jud.Proc.Code Ann. § 9–102(a) (Supp.1988).

The constitutionality of that statute had earlier been upheld by Maryland's highest court in *Wildermuth, supra.* The *Wildermuth* court analyzed the confrontation clause question by following *Ohio v. Roberts,* in which the Supreme Court had conditioned the substitution of a declarant's out-of-court statement for confrontational testimony upon the prosecution's ability to meet two conditions: (1) proof of the unavailability of the declarant; and (2) demonstration that there were sufficient "indicia of reliability ... [to] afford the trier of fact a satisfactory basis for evaluating the truth of the prior statement." 448 U.S. at 65, 100 S.Ct. at 2539, 65 L.Ed.2d at 607. The *Wildermuth* court concluded that the Maryland statute met the *Roberts* standard. To find that the trauma of confrontational testimony would render a child unable to reasonably communicate would be *"tantamount to a finding of unavailability in the Roberts sense,"* the court observed. 310 Md. at 519, 530 A.2d at 286. The court further observed that cross-examination, testimony under oath, and the ability of the judge, jury, and accused to view the witness during testimony met the *Ohio v. Roberts* test of reliability. *Id.* at 515, 530 A.2d at 285. Commenting that "[t]he statute sets a difficult standard, as it should, when dealing with matters involving the constitutional rights of a presumptively innocent defendant," the Maryland court upheld its constitutionality. *Id.* at 523, 530 A.2d at 288.

In *Craig* the Maryland Court of Special Appeals revisited the issue in the aftermath of *Coy* and reconfirmed the validity of Maryland's procedure. The *Craig* court stressed the "high statutory threshold" that must be crossed to justify abridgment of a defendant's confrontation rights:

> [O]rdinarily the judge should observe and question the child. Additionally, testimony about the likely impact on the particular child must be specific and must show much more than mere nervousness or excitement or some reluctance to testify.... While the testimony need not be given in the precise words of the statute, it must be clear that the statutory requirements are met in substance.... Testimony about the likely impact on the child testifying must be definite, related to the statutory standard, and specific to the potential child witness him or herself.

*Craig,* 76 Md.App. at 285, 544 A.2d at 801 (quoting *Wildermuth,* 310 Md. at 524, 530 A.2d at 289).

Arizona's statute lacks the specificity of Maryland's. As we have indicated, it necessarily contemplates that the trial judge will exercise discretion in accordance with the state and federal constitutions; yet it leaves the limits of that discretion to be elucidated by the courts. Maryland's analysis of the *Ohio v. Roberts* criterion of unavailability assists us in supplying one basis for the proper exercise of such discretion.

A central finding in *Wildermuth* and *Craig* was that the unavailability criterion would be satisfied by a well-grounded judi-

cial determination that a child witness would be so traumatized by face-to-face confrontation as to be prevented from reasonably communicating. This court made a similar finding in a different context in *State v. Robinson*, 153 Ariz. 191, 735 P.2d 801 (1987). There a five year old child had been sexually abused by the defendant. The trial court found the child "unavailable" for testimony at trial. The child's out-of-court statements were admitted into evidence pursuant to A.R.S. § 13–1416, the "Minor Sexual Victim Testimony Act." We held that statute an unconstitutional infringement on the rule-making authority of the judiciary. However, we held that the statements were properly admitted pursuant to existing exceptions to the hearsay rule. The defendant argued that the admission of such testimony violated his confrontation rights under the state and federal constitutions. We rejected that argument, finding under *Ohio v. Roberts* that the witness was unavailable and that her out-of-court statements bore adequate indicia of reliability. Pertinent for present purposes is our analysis of the issue of unavailability, an analysis parallel to that of *Wildermuth* quoted above. We stated:

> The trial judge held that Nicole was "unavailable" to testify ... because of an existing mental infirmity. The trial judge based his finding on expert testimony indicating that Nicole would be uncommunicative if asked about the assault and could be further traumatized by courtroom proceedings. He also reviewed the transcripts of Nicole's prior unsuccessful attempts at live and videotaped testimony. Based on this evidence, the court concluded that because of her age and the trauma resulting from sexual abuse, Nicole was *incapable* of testifying about the event. Although it is generally preferable for the trial judge to personally examine the declarant, the court of appeals correctly determined that there was sufficient evidence in this

case for the judge, in his discretion, to find that Nicole's in-court testimony was "unavailable."

*Robinson*, 153 Ariz. at 203–04, 735 P.2d at 813–14 (emphasis in original).

We build on *Robinson* today in giving a partial answer to the question left open in *Coy*: whether any exceptions exist to the "right to *meet face to face* all those who appear and give evidence *at trial*." — U.S. at ——, 108 S.Ct. at 2803, 101 L.Ed.2d at 867. An exception exists, we hold, under both the state and federal constitutions, where the state sustains its burden of proving by an individualized showing to the trial court that face-to-face testimony would so traumatize a child witness as to prevent the child from reasonably communicating. Like Maryland, we conclude that such a finding is "tantamount to a finding of unavailability in the *Roberts* sense," *Wildermuth*, 310 Md. at 519, 530 A.2d at 286, and would justify the substitution of the videotaped procedure established by A.R.S. § 13–4251. In so holding, we observe that § 13–4251 preserves all aspects of the defendant's confrontation rights except the right to receive accusatory testimony face-to-face. We also observe that the statute permits the trial court authority to assure that videotaping will occur in a neutral, courtroom-like atmosphere.

We need not analyze this issue differently under the state and federal constitutions. Although our state constitution is more explicit in its assurance of the right of face-to-face confrontation,[7] the difference is inconsequential to the resolution of this case. Even though the federal confrontation clause does not contain the words "face-to-face," the Supreme Court has long held face-to-face confrontation to be its essence. *See California v. Green*, 399 U.S. 149, 175, 90 S.Ct. 1930, 1943, 26 L.Ed.2d 489, 506 (1970) (Harlan, J., concurring) *quoted in Coy*, — U.S. at ——, 108 S.Ct. at 2800, 101 L.Ed.2d at 863. Correla-

---

**7.** Article 2, § 24 of the Arizona Constitution provides in pertinent part, "In criminal prosecutions, the accused shall have the right ... to meet the witnesses against him face to face...." The Sixth Amendment to the Constitution of the United States provides in pertinent part, "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him...."

tively, even though the Arizona confrontation clause explicitly provides the right to meet adverse witnesses face-to-face, we have never interpreted that provision "literally to require the exclusion of all statements of persons who do not appear at trial." *State v. Edwards*, 136 Ariz. 177, 181, 665 P.2d 59, 63 (1983); *see also Robinson*, 153 Ariz. at 203, 735 P.2d at 813; *Vess*, 157 Ariz. at 238, 756 P.2d at 335. To date, analysis under each provision has been the same; the validity of substitution for face-to-face confrontation has turned on satisfaction of the two *Ohio v. Roberts* criteria—unavailability and reliability. Whether there are substantive differences between the clauses is a question we have not yet been called upon to decide and need not decide today.

We recognize that the answer we now give to *Coy* is only a partial one. We provide this much of an answer because it is foreshadowed by *Ohio v. Roberts*, as applied in Maryland's *Wildermuth* and *Craig* decisions and in our own *Robinson* case, and because the "unavailability" analysis of those decisions enables us to give some present guidance to the Arizona courts in the pressing question of the usage of A.R.S. § 13–4251 *et seq.* The weighty question remains, however, whether upon a showing not tantamount to *Roberts* unavailability—for example, a showing that face-to-face testimony would likely be traumatic, but not so disabling as to render the child unable to reasonably communicate—the state's interest in protecting a child witness would overcome the fundamental confrontational rights of a defendant. We deem it wiser to leave that question undecided until confronted with a case where the record presents it squarely.

## IV. CONCLUSION

For the reasons set forth in this opinion, the judgment of conviction is reversed, and the case is remanded for the grant of a new trial.

FELDMAN, V.C.J., CAMERON and MOELLER, JJ., and HOLOHAN, J. (Retired), concur.

Chief Justice FRANK X. GORDON, Jr. did not participate in this decision; pursuant to Ariz. Const. art. 6, § 3, NOEL FIDEL, Judge, Court of Appeals, Division One, was designated to sit in his stead; Justice CORCORAN did not participate in the determination of this matter.