NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

STATE OF ARIZONA, *Appellee,*

*v.*

CONRAD ANTHONY TULL, *Appellant.*

No. 1 CA-CR 15-0591
FILED 7-20-2017

Appeal from the Superior Court in Maricopa County
No.  CR2011-008033-002
CR2011-123789-027
The Honorable Sherry K. Stephens, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Terry M. Crist
*Counsel for Appellee*

Law Offices of Harriette P. Levitt, Tucson
By Harriette P. Levitt
*Counsel for Appellant*

## MEMORANDUM DECISION

Judge Paul J. McMurdie delivered the decision of the Court, in which Presiding Judge Kent E. Cattani and Judge Jon W. Thompson joined.

**M c M U R D I E**, Judge:

**¶1**      Conrad Anthony Tull appeals his convictions and sentences in CR2011-008033-002 and CR2011-123789-027 for the following offenses: one count each of illegal control of an enterprise, a class 3 felony; conspiracy to commit sale or transportation of marijuana in an amount of two pounds or more, a class 2 felony; possession of marijuana for sale in an amount of four pounds or more, a class 2 felony; conspiracy to commit money laundering in the second degree, a class 3 felony; three counts of money laundering in the second degree, class 3 felonies; six counts of use of wire communication or electronic communication in drug related transactions, class 4 felonies; and four counts of sale or transportation of marijuana in an amount of two pounds or more, class 2 felonies.[1] The superior court conducted a dual jury trial that resulted in the guilty verdicts for Tull and three codefendants. Tull argues the superior court erred by allowing the State to present certain evidence to both jury panels, and by admitting expert testimony. He also raises a claim of prosecutorial misconduct. For the following reasons, we affirm.

## FACTS[2] AND PROCEDURAL BACKGROUND

**¶2**      Police conducted a four-month long wiretap investigation into a nationwide drug trafficking organization ("DTO") that utilized a package delivery company to ship large quantities of marijuana from Maricopa County to the eastern United States. The DTO would also ship

---

[1]     The superior court consolidated the cases for trial.

[2]     We view the facts in the light most favorable to upholding the verdicts and resolve all reasonable inferences against the defendant. *State v. Harm*, 236 Ariz. 402, 404, ¶ 2, n.2 (App. 2015) (citing *State v. Valencia*, 186 Ariz. 493, 495 (App. 1996)).

boxes containing tens of thousands of dollars to the Phoenix area. Tull was the "mastermind" of the organization.

¶3            Anonymous tips by Warren Braithwaite, a member of the DTO, prompted the investigation, which revealed that Tull, his brother Clarence, and Braithwaite would establish through telephone conversations with Hope Ezeigbo, the delivery driver, the locations and times to transfer the drugs to Ezeigbo and to pick up the boxes of cash from him. During these calls, the men spoke in coded English that borrowed words and phrases from Guyanese, an English-based Creole.

¶4            The State indicted numerous individuals including the Tulls, Braithwaite, Ezeigbo, and Sherry Washington, who was responsible for, among other things, establishing bank accounts for depositing the drug proceeds. Braithwaite eventually pled guilty to an amended charge of conspiracy to commit sale or transportation of marijuana and to one count of sale or transportation of marijuana in exchange for his testimony at the Tulls', Ezeigbo's, and Washington's joint trial.

¶5            Before trial, Tull moved to sever his trial from his codefendants, arguing mutually exclusive antagonistic defenses would result in irreparable prejudice. The court denied the motion but ordered a trial consisting of two juries: one jury panel considered Tull's and his brother's cases (Panel A), and the other panel considered Washington's and Ezeigbo's cases (Panel B). In addition to separately hearing the charges against the respective defendants, each panel also heard opening statements and closing arguments that related only to the panel's corresponding defendants.

¶6            The jury found Tull guilty of the 17 charges as previously noted. For six of the counts, the jury also determined Tull was a serious drug offender. The court imposed concurrent sentences, the longest of which were life in prison for the six convictions related to Tull's serious drug offender status. The court granted Tull permission to file a delayed notice of appeal, and he did so. We have jurisdiction pursuant to Arizona Revised Statutes ("A.R.S.") sections 12-120.21(A)(1), 13-4031, and -4033(A)(1).[3]

---

[3]      We cite to the current version of applicable statutes and rules when no revision material to this case has occurred.

**DISCUSSION**

### A. The Superior Court Did Not Abuse Its Discretion by Utilizing Dual Juries.

¶7 Tull argues the superior court erred by allowing both jury panels to hear all the evidence admitted against the four defendants. He asserts Panel A heard trial evidence "that would never have been admissible against [him] under normal circumstances." Tull also speculates that, due to the "vast volume of evidence[,]" the jurors could not "possibly exclude every piece of evidence that applied only to the codefendants." Specifically, Tull refers to the testimony of two witnesses.[4]

¶8 We review the trial court's decision to employ dual juries for an abuse of discretion. *Hedlund v. Sheldon*, 173 Ariz. 143, 143 (1992). To justify reversal, a defendant must demonstrate prejudicial error. *State v. Prasertphong*, 206 Ariz. 70, 93, ¶ 96 (2003). We also review a trial court's evidentiary rulings for an abuse of discretion. *State v. Davolt*, 207 Ariz. 191, 208, ¶ 60 (2004).

¶9 Tull first contends Panel A should not have considered the testimony of Kevin Mucthison, an individual involved with a rival drug trafficking organization that operated similarly to the one in this case, particularly by relying on Ezeigbo as the delivery person responsible for shipping marijuana out of state and receiving boxes of money. The trial court denied Tull's request to excuse Panel A during Mucthison's direct examination, but the court did grant the defendants' requests to excuse their respective panels when a defendant associated with the other panel cross-examined Mucthison.

¶10 Braithwaite testified that Ezeigbo had informed him that he (Ezeigbo) was also working with Mucthison's "people." Braithwaite further testified that he had a conversation with Ezeigbo regarding Tull's knowledge of Ezeigbo working with Mucthison, and Braithwaite believed Ezeigbo did not want Tull to know he (Ezeigbo) was working with

---

[4] Tull does not challenge the trial court's discretionary authority to conduct a dual jury trial. *See State v. Prasertphong*, 206 Ariz. 70, 92, ¶ 92 (2003) ("This court has generally approved the use of dual juries, recognizing that trial judges have broad discretion to employ particular trial techniques to meet a specific problem in a single case."), *judgment vacated on other grounds by Prasertphong v. Arizona*, 541 U.S. 1039 (2004).

Mucthison. Mucthison subsequently testified on direct examination that before and during the investigation in this case he collaborated with Ezeigbo in sending boxes of marijuana from Phoenix to the East Coast.[5]

¶11          The superior court did not abuse its discretion by allowing Panel A to consider Mucthison's direct testimony. Mucthison corroborated Braithwaite's testimony that Ezeigbo and Mucthison together facilitated out-of-state shipments of marijuana, a fact that Ezeigbo did not want Tull to know. Considering Tull's argument to the jurors generally challenging Braithwaite's credibility, Mucthison's testimony was relevant and properly introduced to Panel A to evaluate Braithwaite's truthfulness.

¶12          Tull also contends the court erred by permitting the State to present Panel A with Braithwaite's redirect testimony explaining his emotional testimony during his direct examination. In response to questions during Washington's and Ezeigbo's cross-examination of Braithwaite in the presence of both panels, Braithwaite admitted he was "teary eyed" during parts of his direct testimony and that he "cr[ied]" during his free talk before he plead guilty. For example, the following exchange during Ezeigbo's questioning implied that Ezeigbo believed Braithwaite's crying was a fabrication:

> Q.    Now, you said you also took acting lessons, correct?
>
> A.    Yes, sir.
>
> Q.    And you said part of those lessons, well, would part of those lessons include how to cry on screen?
>
> A.    No, sir.
>
> Q.    So you never had any lessons on crying on screen?
>
> A.    No, sir.
>
> Q.    And have you had a chance to see your video when you were interviewed, the free talk?
>
> A.    I haven't seen anything.

---

[5]          On cross-examination, Mucthison testified that he did not know Tull and was not involved in any illegal activity with him.

Q.     Okay. You heard [Washington's counsel] does you
       [sic] about you crying in your free talk, correct?

A.     Yes.

Q.     And you had a moment of emotion the first day on the
       stand, correct?

A.     It wasn't the first day.

Q.     Second day?

A.     I believe so.

Q.     Okay. And would it be strange to you that you use the
       exact same gestures in your free talk as you did on the
       stand in terms of your emotional state?

A.     No, sir.

Q.     Okay. Because that's what your training has taught
       you, correct?

A.     No, sir.

¶13     Over Tull's objection, the trial court allowed the State on re-direct—again in front of both panels—to elicit from Braithwaite that his tearfulness resulted from his fear of the Tull brothers' potential reprisals in response to his cooperation with the State. The court ordered Braithwaite's redirect testimony be "sanitized" so the specific acts that gave rise to Braithwaite's fear would not be presented to the juries. Tull argues that, because Ezeigbo's and Washington's—not the Tulls'—attorneys "opened the door," the court erred by permitting the State to elicit testimony in front of Panel A regarding Braithwaite's fear of the Tull brothers' reprisals.[6]

¶14     The record does not support Tull's factual premise regarding which party opened the door to Braithwaite's redirect testimony. Per the transcripts, Tull's attorney attempted to impugn Braithwaite's credibility by eliciting his testimony on cross-examination that inferred Braithwaite's lavish lifestyle depended on the large income he received from the DTO.

---

[6]     In his reply brief, Tull argues "the inordinate amount of time" required to select the jurors deprived him of due process. Because Tull did not raise this argument in his opening brief, we do not address it. *State v. Cannon*, 148 Ariz. 72, 79 (1985).

When counsel then asked Braithwaite whether he continued participating in the DTO despite receiving a $20 million "deal" in his legitimate construction business, Braithwaite answered, "Yes, and that's when I was trying to give anonymous tip [sic] so I could remove [sic] because I know if they find out, it wouldn't be nice for my situation." Tull's counsel responded: "I understand you want to explain, you know, the phone calls and stuff and [the prosecutor] will get up and give you an opportunity to explain that when he has his chance, again, okay[.]" Thus, Tull himself opened the door to Braithwaite's redirect testimony regarding his motivation for informing police of the DTO. And more basically, Braithwaite's explanation for his emotional responses during his free talk and testimony on direct was relevant for Panel A's evaluation of Braithwaite's credibility in general. No error occurred.

¶15        Furthermore, even if the trial court erred by allowing the State to present Mucthison's and Braithwaite's testimony to Panel A, Tull has not established any resulting prejudice. The court instructed the jurors that Panel A would determine the Tull brothers' guilt or innocence and Panel B would be similarly responsible with respect to Ezeigbo and Washington. The court also admonished the jurors to consider the evidence against each defendant separately and to "determine the verdict as to each of the crimes charged based upon the Defendant's own conduct and from the evidence which applies to that Defendant, as if that Defendant were being tried alone." Presuming the jurors followed these instructions, as we must, Tull fails to establish the requisite prejudice for finding reversible error in the court's decisions to use dual juries and to permit the introduction of Mucthison's and Braithwaite's testimony to Panel A. *See State v. Murray*, 184 Ariz. 9, 25 (1995) (finding no prejudice in light of a similar instruction because "[w]ith such an instruction, the jury is presumed to have considered the evidence against each defendant separately in finding both guilty"); *State v. McCurdy*, 216 Ariz. 567, 574, ¶ 17 (App. 2007) (this court presumes jurors follow the trial court's instructions).

**B.        The Superior Court Did Not Abuse Its Discretion by Admitting the Translations of the Wiretapped Telephone Conversations.**

¶16        Over Tull's objection based on Arizona Rule of Evidence 702, the State introduced into evidence defendants' wire-tapped and recorded telephone conversations that were translated into English by S. Richards. Tull argues admission of the translated conversations and Richards's testimony regarding the subject matter of those conversations violated his constitutional rights to due process and a fair trial because Richards was not a qualified interpreter or expert witness.

¶17        Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Rule 702 is not "intended to permit a challenge to the testimony of every expert, [or] preclude the testimony of experience-based experts[;]" rather, the rule "recognizes that trial courts should serve as gatekeepers in assuring that proposed expert testimony is reliable[.]" *Id.* cmt.; *see State v. Bernstein*, 237 Ariz. 226, 229, ¶ 14 (2015) ("The overall purpose of Rule 702 . . . is simply to ensure that a fact-finder is presented with reliable and relevant evidence, not flawless evidence.") (quoting *State v. Langill*, 945 A.2d 1, 10 (N.H. 2008)).

¶18        We liberally construe whether a witness is qualified as an expert. *State v. Delgado*, 232 Ariz. 182, 186, ¶ 12 (App. 2013). "If an expert meets the 'liberal minimum qualifications,' [his or her] level of expertise goes to credibility and weight, not admissibility." *Id.* (quoting *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 809 (3d Cir. 1997)). We review a superior court's ruling on the admissibility of expert testimony for an abuse of discretion. *State v. Salazar–Mercado*, 234 Ariz. 590, 594, ¶ 13 (2014).

¶19        Applying Rule 702 here, we conclude Richards was qualified to testify regarding the translations of the telephone conversations that utilized Guyanese. Richards testified that she was born in Jamaica and lived there for 16 years. She stated she was fluent in Jamaican Patois, which she explained is an English-based Creole that "is pretty much the same and all related" to Guyanese Creole. At the time she participated in this case's investigation as a translator for police intercepting the telephone calls conducted in Guyanese, Richards testified she worked for a translation services provider that required she pass a proficiency examination in Jamaican Patois.

¶20       Richards described Guyanese as "broken English" with a distinct accent, and she opined: "[F]or English speakers[,] if they listen intently [to Guyanese] or are surrounded by the culture, they can eventually learn to understand even though they may not be speaking, they will be able to understand it." Richards explained that Guyanese and Jamaican vocabularies exhibit some differences, but she also testified that, during her time living in Jamaica (and while in the United States), she encountered people from Guyana and never had problems understanding or communicating with them.

¶21       Based on the foregoing testimony, Richards's knowledge and experience qualified her to provide a reliable opinion regarding the English meaning of the Guyanese used by the defendants in conducting the DTO's business. Accordingly, the trial court did not abuse its discretion by admitting Richards's expert opinion into evidence.

¶22       Tull's complaints that Richards lacked formal training in language interpretation and was not a certified interpreter go to the weight, not admissibility, of Richards's testimony and her translated transcripts of the conversations.[7] *See Davolt*, 207 Ariz. at 210, ¶ 70 ("The degree of qualification goes to the weight given the testimony, not its admissibility."). Similarly, Tull's criticism of Richards's failure to produce a transcript of the wiretaps in Guyanese and the State's failure to present an individual to confirm Richards's translations are factors that may affect the evidence's weight, not its admissibility.

¶23       Tull's assertions that Richards failed to describe the methodology she followed and to provide a verbatim translation are not supported by the record. Richards testified about her knowledge and experience with the Guyanese language and she explained that she listened to the phone conversations, wrote down the English translations of the conversations in summary form, and again listened to the conversations "over and over again" to prepare verbatim transcripts. Exhibits 213 and 214 contain the written verbatim English translations of the Guyanese conversations.

¶24       Finally, we reject Tull's assertion that the State improperly shifted the burden of proof to the defense by advising the court defendants had an opportunity to provide their own translator, but chose not to do so.

---

7       Tull's reliance on Arizona Rule of Evidence 604 is misplaced. That rule requires court interpreters to be qualified and sworn before translating. Ariz. R. Evid. 604. Richards was not a court interpreter.

In *State v. McKinley*, we held that the burden of proof did not shift to the defendant when the State disclosed to a jury that the defendant failed to test semen samples despite having the opportunity to do so. 157 Ariz. 135, 138 (App. 1988). Likewise, here, the State did not engage in burden-shifting by commenting on defendants' failure to obtain their own translations of the telephone conversations. In any event, the State made the comment to the court out of the presence of the juries, who were properly instructed on the presumption of innocence, burden of proof, and reasonable doubt.

## C. Prosecutorial Misconduct.

¶25 Tull argues the prosecutor engaged in misconduct by repeatedly vouching for Braithwaite's veracity. We disagree.

¶26 To prevail on a claim of prosecutorial misconduct, a defendant must demonstrate that "(1) misconduct is indeed present; and (2) a reasonable likelihood exists that the misconduct could have affected the jury's verdict, thereby denying defendant a fair trial." *State v. Moody*, 208 Ariz. 424, 459, ¶ 145 (2004).

¶27 Improper vouching occurs if the prosecutor (1) places the prestige of the government behind its witness, or (2) suggests that information not presented to the jury supports the witness's testimony. *State v. Vincent*, 159 Ariz. 418, 423 (1989). The first type of vouching consists of personal assurances of a witness's truthfulness. *State v. King*, 180 Ariz. 268, 277 (1994). The second type involves prosecutorial remarks that bolster a witness's credibility by reference to material outside the record. *Id.*

¶28 Tull contends the prosecutor engaged in vouching by repeatedly emphasizing during his direct examination of Braithwaite that Braithwaite promised as part of his plea agreement to testify truthfully.[8] Because Tull did not object to the challenged comments, the issue is waived absent fundamental error. *State v. Roscoe*, 184 Ariz. 484, 497 (1996). Accordingly, Tull bears the burden to establish that "(1) error exists, (2) the

---

[8] Tull also disputes the trial court's refusal to grant a new trial based on the prosecutor's failure to disclose evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). We addressed this issue in Washington's appeal and concluded the trial court acted within its discretion by finding the undisclosed material would not have affected the verdicts. *State v. Washington*, 1 CA-CR 14-0808, 2017 WL 1325212, *4, ¶¶ 14–15 (April 11, 2017). We discern no principled reason to reconsider that conclusion.

error is fundamental, and (3) the error caused him prejudice." *State v. James*, 231 Ariz. 490, 493, ¶ 11 (App. 2013) (internal quotation omitted).

**¶29** The prosecutor's line of questioning was not vouching; rather, the prosecutor properly elicited evidence to rebut the defendants' arguments challenging Braithwaite's truthfulness. *See State v. McCall*, 139 Ariz. 147, 158–59 (1983) (rejecting argument that eliciting testimony regarding witness's promise, because of a guilty plea to testify truthfully, amounted to vouching).

**¶30** Tull also argues the prosecutor "attempted" to vouch for Braithwaite by asking a detective if Braithwaite was the source of one of the anonymous tips. This also does not amount to vouching. Moreover, the detective responded that he was unable to confirm the tip's source.

**¶31** Not only does Tull fail to establish error, he does not satisfy his burden of showing prejudice. Tull argues he was prejudiced by the "vouching" because Braithwaite was "otherwise a far from credible witness." Properly addressing this argument would require us to assess Braithwaite's credibility. This court, however, does not make credibility determinations, the jury does. *State v. Soto-Fong*, 187 Ariz. 186, 200 (1996).

**¶32** Because vouching did not occur, Tull's prosecutorial misconduct claim fails.

## CONCLUSION

**¶33** Tull's convictions and sentences are affirmed.

